USDC SCAN INDEX SHEET

















SWD    11/16/04    13:56

3:04-CV-02288   SLATNICK V. DEUTSCHE BANK AG

*1*

*NTCREM.*

21632

1 | David S. McLeod (SBN: 66808)
Caroline Burgunder (SBN: 217330)
2 | DEWEY BALLANTINE LLP
333 South Grand Avenue
3 | Los Angeles, California 90071-1530
Telephone: (213) 621-6000
4 | Facsimile: (213) 621-6100

FILED

NOV 1 5 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

5 | Attorneys for Defendants
DEUTSCHE BANK AG AND
6 | DEUTSCHE BANK SECURITIES INC.,
d/b/a DEUTSCHE BANK ALEX. BROWN

7

8 | **IN THE UNITED STATES DISTRICT COURT**

9 | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | KEVIN SLATNICK and JOHN
SONNENBERG,
12 |
Plaintiffs,
13 |
vs.
14 |
DEUTSCHE BANK AG; DEUTSCHE
15 | BANK SECURITIES INC. d/b/a
DEUTSCHE BANK ALEX. BROWN;
16 | CORNERSTONE STRATEGIC
ADVISORS, LLC; ROGER FULLER; D.
17 | MICHAEL BISHOP; CANTLEY &
SEDACCA, LLP; EDWARD SEDACCA,
18 | ESQ.; CLARION CAPITAL LLC; CF
ADVISORS, LLC; DAN BROOKS; AND
19 | DOES 1-50 inclusive,
20 |
Defendants.

04 CV 2288    LAB (JMA)

Case No.

**DEUTSCHE BANK AG'S AND
DEUTSCHE BANK SECURITIES INC.'S,
d/b/a DEUTSCHE BANK ALEX. BROWN,
NOTICE OF REMOVAL OF ACTION TO
FEDERAL COURT PURSUANT TO 28
U.S.C. §§ 1441, 1332 AND 9 U.S.C. § 205**

Complaint Filed: September 27, 2004

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

21
22
23
24
25
26
27
28



**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF CALIFORNIA:**

PLEASE TAKE NOTICE that Defendants Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown (collectively, "Deutsche Bank") hereby remove to this Court the State Court action described below on two alternative grounds. First, Deutsche Bank removes this case pursuant to 28 U.S.C. §§ 1441 and 1332 because it is an action with a matter in controversy exceeding the sum or value of $75,000, exclusive of interest and costs, which involves citizens of different States. Second, Deutsche Bank removes this case pursuant to 9 U.S.C. § 205 because it relates to an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

## I.   BACKGROUND AND PROCEDURAL HISTORY

1.     On or about September 27, 2004, a complaint captioned *Kevin Slatnick and John Sonnenberg versus Deutsche Bank AG; Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown; Cornerstone Strategic Advisors, LLC; Roger Fuller; D. Michael Bishop; Cantley & Sedacca, LLP; Edward Sedacca, Esq.; Clarion Capital, LLC; CF Advisors, LLC; Dan Brooks; and Does 1-50, inclusive*, Case No. GIC836362, was filed in the Superior Court of the State of California for the County of San Diego ("Complaint" or "Compl.").

2.     Plaintiffs served the Complaint on Deutsche Bank AG by serving its agent for receipt of process by certified mail on or about October 14, 2004. Plaintiffs served Deutsche Bank Securities Inc. by personally serving its agent for receipt of process on or about October 15, 2004. Copies of the Summonses, the Complaint and all process, pleadings and orders that have been served on or received by Deutsche Bank in this action are attached hereto as Exhibit 1, as required by 28 U.S.C. § 1446(a).

3.     Clarion Capital, LLC ("Clarion") was served on or about October 15, 2004. Dan Brooks ("Brooks") was served on or about October 15, 2004. Roger Fuller ("Fuller") was served on or about October 15, 2004. On information and belief, CF Advisors, LLC ("CF Advisors"), Cornerstone Strategic Advisors, LLC ("Cornerstone"), D. Michael Bishop

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1



1   ("Bishop"), Cantley & Sedacca, LLP ("Cantley & Sedacca") and Edward Sedacca, Esq.

2   ("Sedacca") have not yet been served.

3       4.    Defendant Deutsche Bank will file promptly a copy of this Notice of

4   Removal with the clerk of the county court where the action has been pending.

5   ## II.   THE COMPLAINT

6       5.    Plaintiffs are two individuals, Kevin Slatnick and John Sonnenberg

7   ("Slatnick" and "Sonnenberg" respectively), who, according to the Complaint,[1] sought to avoid

8   liability on taxes from over $1.1 million that each realized from the sale of their business, Sonik

9   Technologies, Inc.[2]  Compl. ¶¶ 4, 53, 58, 61.  The Complaint alleges that Plaintiffs met with

10  Roger Fuller in early December 2001 and discussed an investment strategy known as Market

11  Linked Deposit (the "MLD Strategy").  *Id.* ¶ 59.  According to the Complaint, after signing a fee

12  agreement, Plaintiffs implemented the MLD Strategy which allegedly allowed them to avoid

13  capital gains tax obligations for the year 2001.  *Id.* ¶¶ 61, 65-66.

14      6.    Plaintiffs allege that in October of 2003, they received a letter stating that

15  the Internal Revenue Service considered the MLD Strategy to be "an abusive tax shelter," and

16  were advised to immediately file amended tax returns for the year 2001.  *Id.* ¶ 71.  As a result,

17  after allegedly incurring "fees, costs, interest and unknown tax penalties," *id.*, Plaintiffs filed this

18  lawsuit.

19      7.    Plaintiffs' Complaint alleges six causes of action: (1) negligence against

20  all Defendants; (2) unfair business practices against all Defendants; (3) breach of fiduciary duty

21  against Cornerstone, Bishop, Fuller, the "Clarion Defendants,"[3] Cantley & Sedacca and Sedacca;

22  [1]    Deutsche Bank does not admit any of the factual allegations in the Complaint and

23  expressly reserves the right to contest those allegations at the appropriate time.

24  [2]    According to the Complaint, Plaintiffs agreed to sell Sonik Technologies to Vytek

25

26  Wireless, Inc. in late 1999.  Payment in the form of stock and cash was allegedly to occur during

27  2000 and 2001.  Compl. ¶ 53.

28  [3]    "Clarion Defendants" is not a defined term in the Complaint.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

2



1    (4) aiding and abetting a breach of fiduciary duty against Cantley & Sedacca, Sedacca and

2    Deutsche Bank; (5) breach of contract against Cornerstone, Bishop, Fuller and the "Clarion

3    Defendants"; and (6) professional malpractice against Cantley & Sedacca, Sedacca, Fuller and

4    Bishop.  Plaintiffs allege that they paid more than $100,000 in connection with the investment

5    strategy, *id.* ¶ 61, and now seek the return of all fees and monies paid, as well as legal costs, tax

6    penalties and interest, pre-judgment interest, costs of suit, and attorney's fees, *id.* Prayer for

7    Relief, ¶ 1.

### III.   GROUNDS FOR REMOVAL

#### Diversity Jurisdiction

10         8.       This Court has original jurisdiction over this action because there is

11   complete diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332, and the

12   amount in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and

13   costs.

14         9.       The Complaint alleges that Plaintiffs Slatnick and Sonnenberg are

15   residents of San Diego County, California.  Compl. ¶ 4.

16         10.      At the time of the filing of the Complaint and at the present time,

17   Deutsche Bank AG was and is a German corporation, with its principal place of business in

18   Frankfurt, Germany.  The Complaint does not allege that Deutsche Bank was or is a citizen of

19   the State of California. *See id.* ¶¶ 5-10.

20         11.      At the time of the filing of the Complaint and at the present time,

21   Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown was and is a Delaware

22   corporation with its principal place of business in New York.  The Complaint does not allege that

23   Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown, was or is a citizen of the State

24   of California. *See id.* ¶¶ 5-10.

25         12.      According to the Complaint, Roger Fuller is a resident of Utah, residing at

26   1304 Cambridgetown Cove, Salt Lake City, Utah. *Id.* ¶ 13.  The Complaint does not allege that

27   Fuller was or is a citizen of the State of California.

28

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

3



DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

13.     According to the Complaint, Clarion is a limited liability company with its principal place of business at 10 Bay Street, Westport, Connecticut 06880. *Id.* ¶ 20. Clarion has no members residing in California. The Complaint does not allege that Clarion was or is a citizen of the State of California.

14.     According to the Complaint, CF Advisors is a Connecticut limited liability company. *Id.* ¶ 21. CF Advisors has no members residing in California. The Complaint does not allege that CF Advisors was or is a citizen of the State of California.

15.     According to the Complaint, Dan Brooks is a resident of Connecticut. *Id.* ¶ 22. The Complaint does not allege that Brooks was or is a citizen of the State of California.

16.     According to the Complaint, Cornerstone is a limited liability company organized and incorporated in Utah, with its main offices at 6415 South 3000 East, #200, Salt Lake City, Utah. *Id.* ¶ 11. The Complaint does not allege that Cornerstone was or is a citizen of the State of California.

17.     According to the Complaint, D. Michael Bishop is a resident of Utah, residing at 9517 Glacier Lane, Sandy, Utah. *Id.* ¶ 14. The Complaint does not allege that Bishop was or is a citizen of the State of California.

18.     According to the Complaint, Cantley & Sedacca is a law firm organized and existing under the laws of the State of Georgia with offices in Georgia and Texas. *Id.* ¶ 16. The Complaint does not allege that Cantley & Sedacca was or is a citizen of the State of California.

19.     According to the Complaint, Edward Sedacca, Esq. is a resident of Texas. *Id.* ¶ 17. The Complaint does not allege that Sedacca was or is a citizen of the State of California.

20.     According to the Complaint, Plaintiffs allegedly paid more than $100,000 in connection with the MLD Strategy, *id.* ¶ 61, and they now seek the return of all fees and monies paid, as well as tax penalties and interest, *id.* Prayer for Relief, ¶ 1. Plaintiffs also request exemplary and punitive damages. *Id.* Prayer for Relief, ¶ 3.

4



21.    Venue is proper in this district pursuant to 28 U.S.C. § 1441 because this Court is the United States District Court for the district and division embracing the place where the removed action has been pending.

22.    Each of the named Defendants that has been served with the Complaint has consented to this Notice of Removal. The consents are being filed concurrently herewith.

23.    This Notice of Removal is being filed within thirty days after receipt by any of the Defendants of a copy of the Summons and Complaint, and is therefore timely under 28 U.S.C. § 1446(b).

24.    Accordingly, this action may properly be removed to this Court, pursuant to Title 28 U.S.C. § 1441, *et seq.*, because this Court has original jurisdiction over it, Defendants are not citizens of the state in which the action was brought and this Notice of Removal is being filed within thirty days after receipt by any of the Defendants of the Summons and Complaint through the required service upon them.

Jurisdiction Pursuant to 9 U.S.C. § 203

25.    This Court also has jurisdiction over this lawsuit under 9 U.S.C. § 203, because "[a]n action or proceeding falling under the [Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention")] shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." *Id.*

26.    Under 9 U.S.C. § 205, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." *Id.*

27.    Pursuant to 9 U.S.C. § 202, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title [9 U.S.C. § 2],

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

5



---



falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." *Id.*; *Beiser v. Weyler*, 284 F.3d 665, 666 n.2 (5th Cir. 2002).

28.     Venue is proper in this district under 9 U.S.C. § 205 because this Court is the United States District Court for the district and division embracing the place where the removed action has been pending.

29.     Pursuant to 9 U.S.C. § 205, removal is proper "at any time before the trial [of the action pending in a State court];" therefore there is no thirty day time limit for removal under this provision.

30.     To implement the MLD Strategy, Plaintiffs opened securities brokerage accounts with Deutsche Banc Alex. Brown ("DB Alex. Brown"), a predecessor of Deutsche Bank Securities Inc., which accounts were used to trade foreign currency options over a period of time. According to the Complaint, the foreign currency option trades generated capital losses which were used, as part of the investment strategy, to offset gains on Plaintiffs' personal tax returns. *See* Compl. ¶ 65.

31.     On or about December 15, 2001, Slatnick and Sonnenberg entered into Account Agreements with DB Alex. Brown which governed Plaintiffs' relationship with DB Alex. Brown. Each of the Account Agreements that Plaintiffs executed with DB Alex. Brown contains the same mandatory arbitration clause at Paragraph 19. This provision not only encompasses disputes relating to the activity in these accounts, but also is broadly written to cover all disputes with DB Alex. Brown and its affiliates, including disputes based on prior events or related to other accounts. Specifically, the clause provides that Plaintiffs:

> agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1       any account with you, to the construction, performance or breach
2   of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

3   Account Agreements ¶ 19, attached hereto as Exs. 2-3. Thus, the arbitration agreement covers

4   "any controversies which may arise," and, accordingly, all of Plaintiffs' claims against DB Alex.

5   Brown must be arbitrated.

6       32.    Deutsche Bank AG, Deutsche Bank Securities Inc.'s ultimate parent

7   corporation, can also enforce the arbitration agreements against Plaintiffs for at least three

8   independent reasons.

9       33.    First, Plaintiffs agreed to arbitrate with Deutsche Bank AG. Under the

10  terms of the Account Agreements, Plaintiffs agreed to arbitrate with "you" which is defined,

11  *inter alia*, as the "affiliates" of DB Alex. Brown. *See* Account Agreements, Introductory

12  Paragraph, Exs. 2-3. A parent is an affiliate of any of its subsidiaries. BLACK'S LAW

13  DICTIONARY (8th ed. 2004) (defining "affiliate" as "1. A corporation that is related to another

14  corporation by shareholdings or other means of control; a subsidiary, *parent* or sibling

15  corporation.") (emphasis added); *see also Harold Ives Trucking Co. v. Pickens*, NO. 03-361,

16  2003 WL 22967386, at *2-3 (Ark. Dec. 18, 2003) (citing Black's definition with approval in

17  finding that the "ordinary and usually accepted meaning" of the term "affiliate" includes a parent

18  company). Moreover, the Account Agreements define "affiliate of Deutsche Bank" as

19  "Deutsche Bank AG and its subsidiaries," *see* Account Agreements, Introductory Paragraph,

20  Exs. 2-3, and thus expressly identify DB Alex. Brown and Deutsche Bank AG as affiliates.

21      34.    Second, principles of equitable estoppel prevent Plaintiffs from suing

22  Deutsche Bank AG and DB Alex. Brown as a single integrated entity while at the same time

23  arguing that they are distinct for purposes of the arbitration agreement. *See Wilmot v. McNabb*,

24  269 F. Supp. 2d 1203, 1208 (N.D. Cal. 2003) ("When the charges against a parent company and

25  its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims

26  against the parent to arbitration even though the parent is not formally a party to the arbitration

27  agreement.") (citation omitted). The Complaint itself does not distinguish between Deutsche

28

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

7

1   Bank AG and Deutsche Bank Alex. Brown. *See, e.g.*, Compl. ¶ 5. Moreover, the Complaint

2   alleges that all Defendants "banded and acted together in the scheme to design, develop, market,

3   operate and sell the illegal tax fraud schemes to plaintiffs and the general public" and "each and

4   every [named Defendant] was the agent of each and every other Defendant." *Id.* ¶ 26. As a

5   result of the Plaintiffs' allegations of substantially interdependent and concerted misconduct, the

6   arbitration agreement with DB Alex. Brown estops Plaintiffs from avoiding arbitration with

7   Deutsche Bank AG, as well. *See Boston Telecomms. Group, Inc. v. Deloitte Touche Tohmatsu*,

8   278 F. Supp. 2d 1041, 1048 (N.D. Cal. 2003) (non-signatory may invoke the protections of an

9   arbitration clause "when the signatory to the contract containing an arbitration clause raises

10  allegations of substantially interdependent and concerted misconduct by both the nonsignatory

11  and one or more of the signatories to the contract") (citation omitted).

12      35.    Third, the Account Agreements specifically state that DB Alex. Brown

13  was empowered to engage in foreign currency transactions with Deutsche Bank AG (or an

14  affiliate) and that Deutsche Bank AG would earn its normal commissions, spread or fees for

15  those services. *See* Account Agreements ¶ 16 and Introductory Paragraph, Exs. 2-3. Thus, the

16  Agreements expressly contemplated a role for Deutsche Bank AG in the foreign currency

17  transactions and addressed the nature of the compensation that Deutsche Bank AG would receive

18  for its participation. *See id.* ¶ 16, Exs. 2-3. As a result, Deutsche Bank AG, as an intended

19  beneficiary of the agreement, should be permitted to enforce the arbitration clause. *See In re*

20  *Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 230 (3d Cir. 1998) (parent as

21  third-party beneficiary could enforce arbitration clause).

22      36.    The relationship between Plaintiffs and Deutsche Bank "involve[d]

23  property located abroad, envisage[d] performance abroad, or ha[d] some other reasonable

24  relation with one or more foreign states." 9 U.S.C. § 202. For example, Deutsche Bank AG is a

25  German corporation, *see* Compl. ¶ 5, and it acted as a counterparty to trades with Plaintiffs as

26  part of the MLD Strategy, *see* Confirmations issued by Deutsche Bank AG to Kevin Slatnick and

27  John Sonnenberg, attached hereto as Exs. 4-5. *See also* Compl. ¶ 65 (alleging that as part of the

28  MLD Strategy, "capitalization" by Plaintiffs of entities created for purposes of engaging in the



DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

8

1 | strategy was used "to 'trade' roughly $12,000,000 worth of *foreign currency options* over a

2 | period of time") (emphasis added).   Because the Account Agreements which contain the

3 | arbitration clause arise out of this relationship, the arbitration agreements fall within the

4 | Convention, and removal of this action is therefore proper under 9 U.S.C. § 205.

5 | Dated:  November 15, 2004

DEWEY BALLANTINE LLP
David S. McLeod

By:

David S. McLeod

Attorneys for Defendant Deutsche Bank AG and
Deutsche Bank Securities Inc., d/b/a Deutsche
Bank Alex. Brown

**DEWEY BALLANTINE LLP**
333 South Grand Avenue
Los Angeles, California 90071-1530

9

Pursuant to local rule 5.1(e), Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown, hereby submit the following exhibits in support of their Notice of Removal of Action to Federal Court Pursuant to 28 U.S.C. §§ 1441, 1332 and 9 U.S.C. § 205.

## TABLE OF CONTENTS

Exhibit                                                                                    Page No.

Exhibit 1    Pleadings, Process Orders and Other Filings from State Court Action ...............1

Exhibit 2    Account Agreement for Kevin Slatnick ...............................................51

Exhibit 3    Account Agreement for John Sonnenberg ...........................................55

Exhibit 4    Deutsche Bank AG Confirmation for Kevin Slatnick ..............................59

Exhibit 5    Deutsche Bank AG Confirmation for John Sonnenberg.............................65

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

## DECLARATION OF CAROLINE BURGUNDER

I, Caroline Burgunder, declare as follows:

1.      I am an attorney licensed to practice law in the state of California and am an associate at Dewey Ballantine LLP, counsel for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a/ Deutsche Bank Alex. Brown, in this action.  I make this declaration in support of Deutsche Bank AG's and Deutsche Bank Securities Inc.'s, d/b/a/ Deutsche Bank Alex. Brown, Notice of Removal to Federal Court Pursuant to 28 U.S.C. §§ 1441, 1332 and 9 U.S.C. § 205.  I have personal knowledge of each of the facts stated herein, and if called upon to testify, could and would testify completely thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of all pleadings, process, orders and other filings that my office obtained from the Superior Court of the State of California for the County of San Diego regarding the state court action entitled *Slatnick, et al. v. Deutsche Bank AG, et al.,* Case No. GIC836362.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a Deutsche Bank Alex. Brown LLC Account Agreement for Kevin Slatnick executed by Kevin Slatnick.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a Deutsche Bank Alex. Brown LLC Account Agreement for John Sonnenberg executed by John Sonnenberg.

5.      Attached hereto as Exhibit 4 is a true and correct copy of Confirmations issued by Deutsche Bank AG to Kevin Slatnick.

6.      Attached hereto as Exhibit 5 is a true and correct copy of Confirmations issued by Deutsche Bank AG to John Sonnenberg.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on November 15, in Los Angeles, California.

Caroline Burgunder

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

☒ CENTRAL P.O. BOX 120128, 330 W. BROADWAY, SAN DIEGO, CA 92112-0128,
(619) 531-3141 (CIVIL)     (619) 615-6358 (UNLAWFUL DETAINER)
☐ KEARNY MESA, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187, (858) 694-2066
☐ NORTH COUNTY, 325 S. MELROSE DR., VISTA, CA 92083-6698, (760) 726-9595
☐ EAST COUNTY, 250 E. MAIN ST., EL CAJON, CA 92020-3941, (619) 441-4461
☐ RAMONA, 1428 MONTECITO RD., RAMONA, CA 92065-5201, (760) 738-2435
☐ SOUTH COUNTY, 500 3RD AVE., CHULA VISTA, CA 91910-5649 , (619) 691-4780

CASE NUMBER: GIC836362

We are unable to process/enter the attached 3 proofs of service for the reasons indicated below:

☐ Submitted form is obsolete, use the most current revision attached.
☒ Request for Entry of Default / Proof of Service is incomplete; see red X(s) / highlight.
☐ Original amended Proof of Service must be submitted
☐ Submit a new original Request for Entry of Default with **updated** mailing.
☐ An original and one copy of Request For Entry of Default is required
☐ Original ☐ Summons ☐ Proof of Service     is not on file as to
☐ Name of party served / defaulted does not correspond to name of party sued as listed on the complaint.
☐ Name / relationship to party / title or capacity in business must be specified
☐ Proof of service on a corporation does not state that service was made on a person authorized to accept service. (CCP 412.30, 416.10)
☐ Declaration of due diligence is required  (CCP 415.20(b))
☐ Due diligence does not meet requirements.  (Sup. Ct. Rule 5 6)
"Personal service must be attempted three different days at three different times of day. All attempts cannot be in the a.m., nor all in the p.m  At least one of the three attempts must be before 8 a.m  or after 5:30 p.m., and at least one of the three attempts must be between the hours of 8 a.m. and 5:30 p.m. or on Saturday or Sunday at any time.  If service is attempted at a business address, all three attempts may be made during the normal business hours of that business."
☐ Original return receipt must be submitted for service by mail outside California  (CCP 417 20)
☐ Declaration of mailing is not attached to the Proof of Service.
☐ Proof of Service not in acceptable format, must conform to Judicial Council Form pursuant to CRC 982(a).
☐ Service does not comply with ☐ Order for Publication     ☐ Order To Post.
☐ ☐ Statement of Damages ☐ Prejudgment Claim of Right to Possession  not listed among the documents served.
☐ To serve all unknown occupants per CCP 415.46, documents must be ☐ left with an individual (unless there is an active order to post on file) ☐ posted at premises ☐ mailed to the premises by first class mail.
☐ Answer(s), or other document(s) preventing entry of default was filed on.
☐ Request is premature, time to answer will not expire until     . (CCP 415, et seq., GC 6064)
☐ Cannot default Does
☐ Declaration Under CCP 585.5 (section 5 on Request for Default) must be completed
☐ Mailing date cannot be after signature date  see red X(s) / highlight.
☒ Other: The current proof on Fuller shows service was effected on his "spouse". When the certified mail return receipt is signed by someone other that the deft. himself, you must provide evidence that the person signing is authorized to do so. "Spouse" is insufficient to establish that we will accept the words "authorized to accept", which you can use if appropriate.     I have returned also 2 different proofs already on file for incompleteness. On Clarion's POS "agent" is insufficient to describe Brooks' authority to accept service. On Deutsche Bank AGs' POS we must have a name of the person service and a title/capacity that authorizes them to accept service. Note that there is a different valid POS still on file for Clarion from the batch you submitted here
**Please return this form when you resubmit your document(s) and enclose a self-addressed envelope large enough for all documents, stamped with sufficient postage.**

CLERK OF THE SUPERIOR COURT

Date: 11/10/04                                    By. Russell Taylor, Clerk

☐ Checks returned                                Returned via. SASE

Exhibit 1
Page 1

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)*<br>ROBERT SCOTT DREHER, SBN 120527<br>DREHER LAW FIRM<br>835 FIFTH AVENUE, SUITE 202<br>SAN DIEGO, CA 92101<br><br>TELEPHONE NO (619) 230-8828  FAX NO *(Optional)*  (619) 687-0136<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)* Plaintiffs Kevin Slatnick, et al. | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS 330 WEST BROADWAY
MAILING ADDRESS:
CITY AND ZIP CODE SAN DIEGO, CALIFORNIA 92101
BRANCH NAME

| PLAINTIFF/PETITIONER: Kevin Slatnick and John Sonnenberg<br><br>DEFENDANT/RESPONDENT: Deutsche Bank AG, et al. | CASE NUMBER<br>GIC 836362 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No. |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)*: Notice of Case Assignment.

3. a. Party served *(specify name of party as shown on documents served)* Defendant Dan Brooks.

   b. Person served: [X] party in item 3a [ ] other *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served: 23 Park Lane, Wesport, CT 06880

5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**

Legal Solutions® Plus

Code of Civil Procedure, § 417.10

Exhibit 1
Page 2

| PLAINTIFF/PETITIONER Kevin Slatnick and John Sonnenberg | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT Deutsche Bank AG, et al. | GIC 836362 |

c. ☒ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid.

    (1) on *(date)* October 15, 2004    (2) from *(city)* San Diego

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415 30.)

    (4) ☒ to an address outside California with return receipt requested (Code Civ. Proc , § 415 40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
a. ☒ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify).*
c. ☐ as occupant.
d. ☐ On behalf of *(specify)*
    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416 10 (corporation) | ☐ 415 95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416 50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
a. Name: Yassarette A. Hall
b. Address 835 Fifth Ave., Ste. 202, San Diego, CA 92101
c. Telephone number (619) 230-8828
d. The fee for service was: $
e. I am:
    (1) ☒ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐ registered California process server:
      (i) ☐ owner ☐ employee ☐ independent contractor.
      (ii) Registration No.:
      (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct

Date: November 4, 2004

Yassarette A. Hall
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)    ▶    (SIGNATURE)

Exhibit 1
Page 3

**U.S. Postal Service**
**CERTIFIED MAIL₋ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com₋

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ 1.98 | |
| Certified Fee | 2.30 | |
| Return Receipt Fee (Endorsement Required) | 1.75 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | UL.) | |
| Total Postage & Fees | $ 6.03 | |

Sent To Dan Brooks
Street, Apt No. or PO Box No 23 Park Lane
City, State, ZIP+4 Westport, CT 06880

PS Form 3800, June 2002     See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dan Brooks
23 Park Lane
Westport, CT 06880

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]          ☐ Agent
                       ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
11 M BROOKS                       11.23

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

OCT 2 3 2004

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service     7003 2260 0005 6775 6303

PS Form 3811, August 2001     Domestic Return Receipt     2ACPRI-03-P-4061

Exhibit 1
Page 4

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| ROBERT SCOTT DREHER, SBN 120527<br>DREHER LAW FIRM<br>835 FIFTH AVENUE, SUITE 202<br>SAN DIEGO, CA 92101<br><br>TELEPHONE NO: (619) 230-8828   FAX NO (Optional)   (619) 230-8828<br>E-MAIL ADDRESS (Optional)<br>ATTORNEY FOR (Name) Plaintiffs Kevin Slatnick, et al. | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>STREET ADDRESS 330 WEST BROADWAY<br>MAILING ADDRESS<br>CITY AND ZIP CODE SAN DIEGO, CALIFORNIA 92101<br>BRANCH NAME: | |
| PLAINTIFF/PETITIONER: Kevin Slatnick and John Sonnenberg<br><br>DEFENDANT/RESPONDENT: Deutsche Bank AG, et al. | CASE NUMBER<br>GIC 836362 |
| **PROOF OF SERVICE OF SUMMONS** | Ref No. or File No. |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)*: Notice of Case Assignment.

3. a. Party served *(specify name of party as shown on documents served)*: Defendant Clarion Capital, LLC

   b. Person served   [ ] party in item 3a  [X] other *(specify name and relationship to the party named in item 3a)*:
   G. Small, authorized to accept service on behalf of Defendant Clarion Capital, LLC

4. Address where the party was served: 1290 Avenue of the Americas, New York, NY 10104

5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:   (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*:   at *(time)*:   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*   from *(city)*:   or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. July 1, 2004] | **PROOF OF SERVICE OF SUMMONS** | Legal Solutions Plus | Code of Civil Procedure, § 417.10 |

Exhibit 1
Page 5

| PLAINTIFF/PETITIONER: Kevin Slatnick and John Sonnenberg | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: Deutsche Bank AG, et al. | GIC 836362 |

c. [X] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*: October 14, 2004      (2) from *(city)*: San Diego

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [X] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d [ ] **by other means** *(specify means of service and authorizing code section)*

[ ] Additional page describing service is attached

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. [X] as an individual defendant.

  b. [ ] as the person sued under the fictitious name of *(specify)*:

  c. [ ] as occupant.

  d. [ ] On behalf of *(specify)*:

    under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7. **Person who served papers**

  a. **Name:** Yassarette A. Hall

  b. **Address:** 835 Fifth Ave., Ste. 202, San Diego, CA 92101

  c. **Telephone number:** (619) 230-8828

  d. **The fee for service was:** $

  e. **I am:**

    (1) [X] not a registered California process server

    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).

    (3) [ ] registered California process server.

      (i) [ ] owner [ ] employee [ ] independent contractor.

      (ii) Registration No.:

      (iii) County:

8. [X] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  or

9. [ ] I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: November 4, 2004

Yassarette A. Hall
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ _____ (SIGNATURE)

**PROOF OF SERVICE OF SUMMONS**

Exhibit 1
Page 6

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ 1.98 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.03 |

Sent To: *Clarion Capital, LLC*
Street, Apt. No. or PO Box No. *1290 Ave of the Americas*
City, State, ZIP+4 *New York, NY 10104*

PS Form 3800, June 2002          See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Clarion Capital, LLC*
*1290 Avenue of the*
*Americas*
*New York, NY 10104*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name) *K. Small*  | C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article
   (Tra
PS For                                    2ACPRI-03-P-4051

Exhibit 1
Page 7

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):<br>ROBERT SCOTT DREHER, SBN 120527<br>DREHER LAW FIRM<br>835 FIFTH AVENUE, SUITE 202<br>SAN DIEGO, CA 92101<br><br>TELEPHONE NO (619) 230-8828   FAX NO (Optional)   (619) 687-0136<br>E-MAIL ADDRESS (Optional)<br>ATTORNEY FOR (Name): Plaintiffs Kevin Slatnick, et al. | FOR COURT USE ONLY<br><br>F I L E D<br>Clerk of the Superior Court<br><br>OCT 2 9 2004<br><br>By SCOTT SEYLER, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
  STREET ADDRESS 330 WEST BROADWAY
  MAILING ADDRESS
  CITY AND ZIP CODE SAN DIEGO, CALIFORNIA 92101
  BRANCH NAME

| | |
|---|---|
| PLAINTIFF/PETITIONER: Kevin Slatnick and John Sonnenberg<br><br>DEFENDANT/RESPONDENT: Deutsche Bank AG, et al. | CASE NUMBER<br>GIC836362 |
| **PROOF OF SERVICE OF SUMMONS** | Ref No. or File No. |

*(Separate proof of service is required for each party served )*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)* Notice of Case Assignment

3. a. Party served *(specify name of party as shown on documents served)*: Defendant Roger Fuller

   b. Person served: [X] party in item 3a  [ ] other *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served: 2830 Manning Circle, Nesbit, MS 38651

5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served  I informed him or her of the general nature of the papers

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev July 1, 2004] | **PROOF OF SERVICE OF SUMMONS** | Legal Solutions Plus<br>Code of Civil Procedure, § 417.10 |

Exhibit 1
Page 8

| PLAINTIFF/PETITIONER Kevin Slatnick and John Sonnenberg | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: Deutsche Bank AG, et al. | GIC836362 |

c. [X] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* October 15, 2004     (2) from *(city):* San Diego, CA

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [X] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. [ ] **by other means** *(specify means of service and authorizing code section):*

    [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. [X] as an individual defendant

  b. [ ] as the person sued under the fictitious name of *(specify):*

  c. [ ] as occupant.

  d. [ ] On behalf of *(specify):*

    under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other |

7. **Person who served papers**

  a. Name: Yassarette A. Hall

  b. Address: 835 Fifth Avenue, Suite 202, San Diego, CA 92101

  c. Telephone number: (619) 230-8828

  d. The fee for service was: $

  e. I am:

    (1) [X] not a registered California process server.

    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).

    (3) [ ] registered California process server:

      (i) [ ] owner   [ ] employee   [ ] independent contractor.

      (ii) Registration No.:

      (iii) County:

8. [X] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. [ ] I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: October 29, 2004

Yassarette A. Hall
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶                             (SIGNATURE)

Exhibit 1
Page 9

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ 1.98 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.03 |

Postmark Here

Sent To  Roger Fuller
Street, Apt. No.; or PO Box No.  1304 Cambridgetown CV
City, State, ZIP+4  Murray, UT 84123

PS Form 3800, June 2002          See Reverse for Instructions

7003 2260 0005 6775 6334

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Roger Fuller
1304 Cambridgetown CV
Murray, UT 84123

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Roger Fuller    10 25

D. Is delivery address different from item 1?  ☑ Yes
   If YES, enter delivery address below:  ☐ No

2850 Manning C...
Nesbit, MS 38651

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)    7003 2260 0005 6775 6334

PS Form 3811, August 2001        Domestic Return Receipt        2ACPRI-03-P-4081

Exhibit 1
Page 10

| Attorney or Party without Attorney:<br>ROBERT SCOTT DREHER. MATTHEW R MILLER<br>DREHER LAW FIRM<br>835 FIFTH AVE., SUITE 202<br>San Diego, CA 92101<br>Telephone No 619 230-8828       FAX No 619 087-0136 | | | | For Court Use Only |
|---|---|---|---|---|
| Attorney for  Plaintiff | | Ref. No. or File No | | *(stamp)* Clerk of the Superior Court<br>**OCT 2 9 2004**<br>By SCOTT STYLER, Deputy |
| Insert name of Court, and Judicial District and Branch Court<br>SAN DIEGO COUNTY SUPERIOR COURT | | | | |
| Plaintiff SLATNICK | | | | |
| Defendant: DEUTSCH BANK AG, et al | | | | |

| **PROOF OF SERVICE**<br>**SUMMONS & COMPLAINT** | Hearing Date | Time | Dept/Div | Case Number<br>GIC836362 |
|---|---|---|---|---|

1  At the time of service I was at least 18 years of age and not a party to this action.

2.  I served copies of the SUMMONS & COMPLAINT; NOTICE OF CASE ASSIGNMENT

3.  *a* Party served:                          DEUTSCH BANK SECURITIES, INC dba DEUTSCHE BANK ALEX BROWN
                                                c/o CT CORPORATION-AGENT FOR SERVICE
    b. Person served.                           VIVIAN IMPERIAL-PROCESS SPECIALIST

4.  Address where the party was served:         818 WEST SEVENTH STREET, SUITE 200
                                                LOS ANGELES, CA  90017

5.  I served the party.
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of
    process for the party (1) on. Fri., Oct. 15, 2004 (2) at: 1:30PM

6.  The "Notice to the Person Served" (on the Summons) was completed as follows.
    on behalf of·  DEUTSCH BANK SECURITIES, INC. dba DEUTSCHE BANK ALEX BROWN c/o CT CORPORATION-
                   AGENT FOR SERVICE
    Under CCP 416 10 (corporation)

7.  **Person Who Served Papers:**                          Recoverable Cost Per CCP 1033 5(a)(4)(B)
    a. HAKOP JACK DEMIRCHYAN               d.  **The Fee for Service was.**    $50.00
    b. **EXPRESS PROCESS SERVICE**         e.  I am: (3) registered California process server
       P.O BOX 12214                           (i)  Owner
       LA CRESCENTA, CA 91224-0914             (ii)  Registration No.      4475
    c. 323 833-5047, FAX 323 661-9601          (iii)  County               Los Angeles
                                               (iv)  Expiration Date·      Mon, Apr. 11, 2005

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

Date:Tue, Oct. 26, 2004

Judicial Council form POS-010               **PROOF OF SERVICE**          (HAKOP JACK DEMIRCHYAN)
Rule 982.9.(a)&(b) Rev July 1, 2004         SUMMONS & COMPLAINT                              6475.dreher 6571

Exhibit 1<br>Page 11

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

**TO:**
ROBERT S. DREHER (P)

# FILE COPY

---

| | | |
|---|---|---|
| KEVIN SLATNIK | | Case No.: **GIC836362** |
| | Plaintiff(s) | **NOTICE OF CASE ASSIGNMENT** |
| | vs. | |
| | | Judge: **JOAN M. LEWIS** |
| DEUTSCHE BANK AG | | Department: **65** |
| | Defendant(s) | Phone: **619-685-6018** |

---

**COMPLAINT FILED** 09/27/04

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 2.5)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 2.6)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 2.7)

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

**CERTIFICATE OF SERVICE**

I certify that I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at          SAN DIEGO California.

DATED: 09/27/04                          BY: CLERK OF THE SUPERIOR COURT

---

**DREHER LAW FIRM**
Robert Scott Dreher (Bar No. 120527)
Jennifer L. Hamilton (Bar No. 227891)
Historic Louis Bank of Commerce Building
835 Fifth Ave., Suite 202
San Diego, California 92101
Telephone: (619) 230-8828
Facsimile: (619) 687-0136

Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| KEVIN SLATNICK and JOHN SONNENBERG, | Case No.: GIC 836353 |
| Plaintiffs, | **COMPLAINT for DAMAGES and EQUITABLE RELIEF for NEGLIGENCE; BREACH OF CONTRACT; BREACH OF FIDUCIARY DUTY; AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; and UNFAIR, UNLAWFUL & FRAUDULENT BUSINESS PRACTICES.** |
| vs. | |
| DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC. dba DEUTSCHE BANK ALEX BROWN; CORNERSTONE STRATEGIC ADVISORS, LLC; ROGER FULLER; D. MICHAEL BISHOP; CANTLEY & SEDACCA, L.L.P.; EDWARD SEDACCA, ESQ.; CLARION CAPITAL, L.L.C.; CF ADVISORS, L.L.C.; DAN BROOKS; and DOES 1-50, inclusive, | **Plaintiffs Request A Jury Trial.** |
| Defendants. | |

1

Exhibit 1
Page 13

## INTRODUCTION

1.    The Defendants designed, marketed, and operated a large and complex tax fraud scheme which they sold as a package of goods and services to honest taxpayers as a legitimate tax shelter.  The United States Department of Justice finally put a stop to the scheme with a series of injunctions and court actions, but not before Plaintiffs were tricked into paying more than $100,000 into the scheme, and tens of thousands more to undo the damage. Plaintiffs ask this Court's help in recovering these losses.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case is a cause not given by statute to other trial courts.  The monetary damages sought by Plaintiffs total in excess of this Court's jurisdictional minimum, and Defendants are subject to personal jurisdiction in this State.

3.    Venue is proper in this Court because defendants have their principal places of business in, reside in, and/or work in this county, and most or all of the actions and wrongful conduct alleged herein took place in this county.

## IDENTIFICATION OF PARTIES

4.    Plaintiffs KEVIN SLATNICK and JOHN SONNENBERG are residents of San Diego County.  They are each electrical engineers with degrees from Trenton State College (1985) and Michigan Tech

Exhibit 1
Page 14

(1984), respectively.  They have been business partners since 1994 and became clients of Defendants in 2001.

5.  Defendant DEUTSCHE BANK AG is a German corporation with its principal place of business in Frankfurt, Germany, qualified to do and doing business in San Diego County, State of California and other states in the United States. Defendant DEUTSCHE BANK SECURITIES, INC., dba DEUTSCHE BANK ALEX BROWN (DB ALEX BROWN) is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019, qualified to do and doing business in California and other states in the United States. These entities will be referred-to jointly as DEUTSCHE BANK.

6.  Founded in 1870, DEUTSCHE BANK is a joint stock company principally dedicated to financing foreign trade.  DEUTSCHE BANK does business in major financial and banking markets around the world, and as of December 31, 2002 had total assets of approximately $1.25 trillion.  DEUTSCHE BANK offers various investment, financial and related products and services for sale to consumer and corporate clients, and has approximately 67,000 employees and more than 13 million customers in 76 countries.  More than half of its staff works outside Germany.

7.  DEUTSCHE BANK claims to provide its private clients with all-around service extending from banking, account-keeping and securities investment advice to asset management.  In addition, it

3

claims to have a leading position in international foreign exchange, fixed-income and equities trading.

8. DEUTSCHE BANK holds itself out to be a preeminent provider of liquidity in the world's foreign exchange markets and a recognized leader in all aspects of foreign exchange. According to its website it is consistently ranked as one of the top three global foreign exchange providers by *Euromoney* Magazine's industry standard annual Foreign Exchange Poll, both in terms of client perception and market share.

9. DEUTSCHE BANK's Foreign Exchange claims to be committed to the core values of client focus and innovation that allegedly characterize all of its wholesale client businesses. It further claims that its ability to succeed is based on its ability to find the most creative solution available to individual client needs.

10. DEUTSCHE BANK claims that its foreign exchange options franchise is unsurpassed among major players. It further states that its options desk is fully integrated with all parts of its global foreign exchange operations, giving clients 24-hour access to a world of speculative and hedging opportunities. Its DB ALEX BROWN division is a member firm of the New York Stock Exchange (having previously acquired Alex Brown, the U.S.'s oldest brokerage house), and it has its own tax shelter group.

11. Defendant CORNERSTONE STRATEGIC ADVISORS, LLC is a limited liability company doing business in San Diego County and

4

other counties in California. It was organized and incorporated in Utah, and its main offices were at all relevant times located at 6415 South 3000 East, #200, Salt Lake City, Utah. CORNERSTONE filed for incorporation on May 19, 2000. A self-described "wealth advisory firm," CORNERSTONE purported to specialize in and offer a package of financial, tax planning, "tax savings," and other "cutting edge strategies," goods and related services for wealthy or high-income clients. Its advertisements stated that "CORNERSTONE has built an internal infrastructure and a network of alliances that enables it to address all of a client's personal financial objectives." This network allegedly included "experienced attorneys, accountants, and investment consultants." With these advertisements and as part of its affiliation and scheme with DEUTSCHE BANK and CANTLEY & SEDACCA and others to sell bogus tax shelter investments for profit, it actively sought out, and marketed itself to, individuals, including Plaintiffs, whom its research indicated had high incomes, large capital gains, or high net worth, stating that it had helped "numerous clients save millions of dollars in taxes."

12. CORNERSTONE is currently under investigation by the United States Department of Justice for offering illegal "employment leasing" tax-avoidance scams. A permanent injunction was issued against CORNERSTONE and its principals on November 20, 2003 prohibiting them from soliciting the form of tax shelter which is

the subject of this lawsuit, and any other of a number of "tax shelters" which it had offered which purported to report an inflated tax basis (United States of America v. D. Michael Bishop, Roger K. Fuller, and Cornerstone Strategic Advisors, USDC, Dist. of Utah, No. 2:03cv01011).

13. Defendant ROGER FULLER resides at 1304 Cambridgetown Cove, Salt Lake City, UT. FULLER is a certified public accountant with a master's degree in taxation. He is a principal, co-owner, co-founder and managing director of CORNERSTONE. He is also director and president of Fuller Consulting, Inc., the listed agent for CORNERSTONE.

14. Defendant D. MICHAEL BISHOP lives at 9517 Glacier Lane, Sandy, UT. BISHOP, a law school graduate and a member of the Virginia State Bar Association, is a co-founder and managing member of CORNERSTONE.

15. At all relevant times herein Defendant CORNERSTONE STRATEGIC ADVISORS, LLC was inadequately capitalized, and had no genuine or separate existence apart from its principals FULLER and BISHOP, but was and is being used for the sole purpose of permitting these defendants to transact a portion or portions of their business under separate guises and without responsibility for their actions. At all relevant times, FULLER and BISHOP completely controlled, dominated, managed, and operated the CORNERSTONE entity together and intermingled their assets together to suit the

6

Exhibit 1
Page 18

convenience of said Defendants, such that the individuality or separateness of said Defendants did not exist but was instead a ruse to avoid liability for their actions alleged herein.

16. Defendant CANTLEY & SEDACCA, L.L.P., was a law firm organized and existing under the laws of the State of Georgia with offices in Georgia and Texas.  At all relevant times CANTLEY & SEDACCA, L.L.P. did business in the County of San Diego, State of California.  The law firm was formed in March, 2001 at DEUTSCHE BANK's behest specifically in order to help market the bogus tax shelter packages which are the subject of this action, when Craig Brubaker, a DEUTSCHE BANK representative and employee, introduced lawyers Cantley and Sedacca to each other, and later introduced the two lawyers to the CORNERSTONE people, so the group could market and sell bogus tax shelter packages.  Brubaker, who had met SEDACCA when SEDACCA was at another law firm, was also forming partnerships within DEUTSCHE BANK, of which DEUTSCHE BANK approved, for the purpose of personally sharing in the fees earned from the bogus tax shelter packages.  The law firm dissolved in late 2002 just ahead of the legal fallout from its sale of these schemes.

17. Defendant EDWARD SEDACCA is a lawyer, a resident of Texas, and was principal and name partner in the law firm CANTLEY & SEDACCA, LLP.  At all relevant times he did business in the County of San Diego, State of California.

7

Exhibit 1
Page 19

18.  At all relevant times herein Defendant CANTLEY & SEDACCA, L.L.P. was inadequately capitalized, and had no genuine or separate existence apart from its partners and namesakes Beckett G. Cantley and EDWARD SEDACCA, but was and is being used for the sole purpose of permitting the lawyer defendants to transact a portion or portions of their business under separate guises and without responsibility for their actions.

19.  At all relevant times herein Defendant SEDACCA completely controlled, dominated, managed, and operated the law firm entity together and intermingled their assets together to suit the convenience of said Defendants, such that the individuality or separateness of said Defendants did not exist but was instead a ruse to avoid liability for their actions and capacities alleged herein.   SEDACCA and CANTLEY & SEDACCA L.L.P. will be referred-to jointly as the "LAWYER DEFENDANTS."   The LAWYER DEFENDANTS have participated in other tax-avoidance schemes similar to this one, and are defendants in at least 2 other similar civil Federal class-action lawsuits arising from at least one of those (Denney, et al. v. Jenkens & Gilchrist, et al., U.S.D.C., SDNY Case No. 03 CV 5460; Ling v. DEUTSCHE BANK, et al., U.S.D.C., SDNY Case No. 04-CV-04566 (SAS)). The firm's other partner, Beckett G. Cantley, lectures at seminars, writes articles, and teaches law school classes in tax, asset protection, offshore banking and tax shelters.

8

20. Defendant CLARION CAPITAL, LLC, is a limited liability company doing business in San Diego, California, with its principal place of business at 10 Bay Street, Westport, Connecticut 06880. CLARION is in the business of structuring foreign currency based derivative products whose sole purpose is to support abusive tax shelters. CLARION was owned and controlled by Defendant DAN BROOKS.

21. Defendant CF ADVISORS, LLC, is a Connecticut limited liability company doing business in San Diego County California. It is also owned and controlled by defendant DAN BROOKS.

22. Defendant DAN BROOKS is a resident of Connecticut, and at all relevant times was doing business in San Diego County, California. BROOKS is a principal owner and employee, agent and representative of CLARION. He was previously employed in DEUTSCHE BANK's Institutional Trading/Derivative Structuring group from 1996 through 2001, and has 20 years of investment experience involving foreign currency Market Link Deposit transactions, with such firms as Chemical Bank (Institutional Currency Trading group;) Bank of America (Institutional Currency Trading); Lehman Brothers (Chief Currency Trader); and Banque Nationale de Paris (Head of Proprietary Currency Trading).

23. At all relevant times herein Defendants CLARION CAPITAL and CF ADVISORS were inadequately capitalized, and had no genuine or separate existence apart from its principal DAN BROOKS and others who helped establish it. Instead, they were and are being

9

Exhibit 1
Page 21

used for the sole purpose of permitting the defendants to transact a portion or portions of their business under separate guises and without responsibility for their actions.

24. At all relevant times, Defendant BROOKS and others completely controlled, dominated, managed, and operated these entities together and intermingled their assets together to suit the convenience of the DEFENDANTS, such that the individuality or separateness of the DEFENDANTS did not exist but was instead a ruse to avoid liability for their actions and capacities alleged herein.

25. Plaintiffs are unaware of the identities, roles, conduct, and/or legal capacities of other persons involved in the subject scheme and the breaches of duty set forth herein, but believe there may indeed be such others (identified herein as DOES 1-50) who are in some way responsible for such acts, omissions and damages. Plaintiffs will seek leave of Court to amend this complaint to allege their names and roles when ascertained.

26. All the defendants banded and acted together in the scheme to design, develop, market, operate and sell the illegal tax fraud schemes to plaintiffs and the general public, sharing in all aspects including the income and profits therefrom. At all times mentioned herein, each and every Defendant named herein was the agent of each and every other Defendant, and perhaps other people including the illegal tax shelter and its members and direct control-persons. In doing the things alleged herein, each Defendant

---

10

was acting within the course and scope of this agency, and was acting with the consent, permission, authorization, and acquiescence of each of the remaining defendants. The actions of each Defendant were ratified and approved by the other Defendants.

## FACTUAL ALLEGATIONS

27.   The late 1990's and early 2000's, the end of the dotcom era, were a time when many entrepreneurs and business people had reaped the rewards for years of hard work by selling stock, stock options, or an entire successful business.  For the first time in their lives many of these people had piles of cash and, with it, large potential tax bills.  Many didn't know what to do, and didn't keep stables of lawyers, advisors, or accountants from whom to seek advice.

28. Not coincidentally, these novices were met by a barrage of slick advertising and marketing pieces from Defendants promoting tax planning and financial services which promised to "legally reduce or eliminate" taxes on large capital gains or income. The seemingly-legitimate schemes purported to have the blessing and imprimatur of the largest and finest law firms, accounting firms, and banking firms in the world. The shelters worked by generating "paper losses" among business entities newly-created by the promoters for that purpose, using a complicated series of transactions such as stock, option, or foreign currency trades whose every aspect the promoters controlled.  These "losses" would

1 then be used to offset the taxpayer's "gains," thereby reducing or

2 eliminating the taxes owed.

3    29. As the IRS struggled to analyze and keep pace with these

4 "packaged tax-avoidance schemes," the promoters, armed with the

5 resources of top-drawer law firms, accounting firms, and investment

6 banking firms, were able to stay a step ahead of the IRS by quickly

7 morphing or changing the schemes to try to skirt the law.

8

9    30. Finally, having decided that these schemes shared the same

10 common characteristics such that they were not legitimate business

11 transactions but were instead simply created for the purpose of

12 tax-avoidance, and rather than continue to chase each scheme only

13 to see the scheme change, the IRS, on December 27, 1999, issued a

14 "Tax Notice" announcing a general rule intended to put the brakes

15 on these tax frauds, protecting both the U.S. treasury and innocent

16 taxpayers: Notice 1999-59.

17

18 **IRS Notice 1999-59.**

19

20    31. Entitled "Tax Avoidance Using Distribution of Encumbered

21 Property," this "Tax Notice" stated that "the Internal Revenue

22 Service and Treasury Department have become aware of certain types

23 of transactions . . . that are being marketed to taxpayers for the

24 purpose of generating tax losses.  This Notice is being issued to

25 alert taxpayers and their representatives that the purported losses

26 arising from such transactions are not properly allowable for

27 Federal income tax purposes."  The details of this IRS Tax Notice

28

12

sent the clear message to tax professionals that purported "losses"

arising from transactions "lacking in economic substance" would not

be allowed.    In the Notice the IRS listed various types of

transactions as examples of the types of transactions it considered

to be illegitimate.

32.    It is the practice of the IRS to disallow all tax

consequences that result from a business entity if that entity was

either (a) not formed for a legitimate business purpose or (b) the

business lacked "economic substance" aside from the tax benefits it

was designed to generate. In general, the IRS will respect a

transaction if the transaction has "economic substance which is

compelled or encouraged by business or regulatory realities, is

imbued with tax-independent considerations, and is not shaped

solely by tax avoidance features that have meaningless labels

attached." James v. Commissioner (10th Cir. 1990) 899 F.2d 905, 908

(quoting Frank Lyon Co. v. United States (1978) 435 U.S. 561, 583-

584).    Defendants were or should have been aware of these

principles, practices, rules and laws.

33.    A key factor in assessing the economic substance of a

transaction is whether the transaction has any practical economic

effect other than the creation of tax losses. Courts have generally

refused to recognize the tax consequences of a transaction that

does not appreciably affect the taxpayer's beneficial interest

except to reduce tax.    The fact that a transaction could yield only

---

13

an insignificant profit does not imbue the transaction with sufficient economic substance to be respectable for tax purposes. *See* Knetsch v. United States (1960) 364 U.S. 361, 366; ACM Partnership v. Commissioner (3rd Cir. 1998) 157 F.3d 231, 248; Sheldon v. Commissioner (1990) 94 T.C. 738, 768-69. Defendants were or should have been aware of these principles, practices, rules and laws when the sold the tax shelter package to Plaintiffs.

34. The pre-packaged tax shelter schemes designed and sold by Defendants had no practical economic purpose or effect other than the creation of tax losses, and Defendants knew this, so they regularly tried to circumvent the IRS by: (a) changing the mechanics of the tax-avoidance schemes in order to try to create the illusion of "economic substance" or "economic risk;" or (b) simply ignoring the IRS Tax Notices, laws and rules; or (c) both.

**The Myth of the "Risk-Free" Risky Transaction**.

35. Tax legend has it that a tax lawyer at the large, blueblood Texas law firm *Jenkens & Gilchrist*, in a Quixotic quest to help his wealthy clients avoid taxes they were legally-obligated to pay, designed the first such tax-avoidance transaction with the urging, help and advice of international investment banking powerhouse *DEUTSCHE BANK* and a large CPA firm. DEUTCHE BANK's purpose was to make lots of money selling what were, in effect, unique packages of meaningless, risk-free, securities trades.

36. Together they developed a strategy designed to incorporate the appearance of investment risk without actually exposing the client (or themselves) to any such risk, in order to generate predictable, large "paper investment losses" which they could then claim to offset their clients' other real gains and income so as to avoid payment of income taxes. The strategy called for the borrowing of a standard Treasury Security, selling it "short" in an option transaction, then contributing the proceeds of that short sale to a specially-created Partnership in exchange for an interest in that Partnership. By doing so, they opined that the taxpayer could claim that the "basis" of the partnership interest is increased by the cost of the short option, but not reduced by the obligation with regard to its repurchase.

37. The "investment losses" generated from the options transactions (on paper) were then used to offset the taxpayer's other capital gain or income without any real expense or loss of cash on the part of the taxpayer, other than the fees to the lawyers, CPAs and banks for operating the "shelter" (which were just a fraction of the money that would otherwise have been paid to the IRS as capital gains taxes anyway).

38. DEUTSCHE BANK and its law firms and CPA firms who sold these packages to their clients tried to stay one step ahead of the IRS by subtly changing the mechanics of the above-described tax-loss-generation packages ever so slightly into more sophisticated

15

machinations, all designed to create the illusion of economic legitimacy and risk without actually incorporating such.  These strategies had names like market-link deposit (MLD) and COBRA (which the IRS later named "Son of Boss" in Notice 2000-44).  Boiled down, all the schemes involved some form of options trades and worked essentially the same way.

39.  An "option" gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of its market price on the open market -- something such as stocks, bonds, commodities (coffee or pork bellies), foreign currency, or intangible things such as 'market values' like the Standard & Poors composite value.  Options are said to be 'in-the-money' if the price of the underlying 'something' makes exercising the option profitable.  Similarly, options are said to be 'out-of-the-money' if exercising them would result in no gain, or a loss.  While options were originally developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes hang by only a slender thread from any underlying investment or, in some cases such as here, not at all.

40.  Options may be either "American-style" or "European-Style," depending upon whether the option buyer has the right to exercise the option at any time before the expiration or only upon the designated expiration date.  For example, assume an investor

16

buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of December 1, 2004. This option gives the investor the right to purchase 1000 shares of ABC stock for $100 each. Under an American-style option, the option-holder can exercise the option by purchasing the shares at any time and at any price he chooses prior to December 1, 2004. Under a European-style option, the option-holder can only elect to exercise the option on December 1, 2004, and perhaps, as in this case, only at a certain time on that date. If the market price of the shares is greater than $100 each, the holder can buy them at $100 and immediately sell them at the higher price, thus making money.

41. Digital Options are digital in the sense that the investor wins or loses a pre-determined amount in full, but only if the strike price is met - thus, the option is either "on" or "off," like a digital (binary) 1 or 0. As a result, Digital Options provide an investor with the same payout no matter how far above the strike price the underlying stock price goes.

42. For example, a Digital Option may look like this: an investor will receive $1000 if the price of ABC Corp. shares closes at or above $12 per share on December 1, 2004. If the price of ABC Corp. is at or above $12 per share on that date (the "trigger") the investor "wins" $1,000. If the price of the shares does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, stock in

Complaint for Damages & Equitable Relief.

Exhibit 1
Page 29

ABC Corp. never changes hands.  Digital Options are, in reality, nothing more than a Las Vegas wager that a certain thing will have a certain price on a certain date.  But there is no risk when, as here, the DEFENDANTS control the decision to buy and sell both sides of the transactions.

43. All the schemes, including the package which DEFENDANTS sold Plaintiffs, involved the structuring by DEFENDANTS of two opposing digital-options transactions involving a stock, security or foreign currency. But the two transactions, although purportedly independent, were actually neither independent nor even transactions, because the game was rigged.  The DEFENDANTS controlled the buy and sell decisions, and even the 'strike price.' There was one form contract memorializing both what was bought and what was sold.  The contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants.  Neither party had any rights to take possession of the underlying "thing" (in this case, currency). Foreign currency was used so that the "loss" claimed could be either capital or ordinary, under Section 988 of the Internal Revenue Code.  Nothing actually "traded" and it is unclear whether any transactions occurred at all.

**Defendants' Tax Shelter Machine.**

44. At first, DEUTSCHE BANK, *Jenkens & Gilchrist*, and their Accountants sold the "tax shelters" to their own clients, whose

financial conditions (and their clients' attendant needs to offset income and capital gains) they knew well.   But soon they realized they could make even more money selling the same shelters, in canned or pre-packaged form, to many other people, so they branched out to recruit others with access to such people, such as other lawyers, accounting firms, and even marketing and promotion professionals.

45.   DEUTSCHE BANK introduced the individual lawyers, who formed the law firm CANTLEY & SEDACCA specifically to market these "packages" and provide canned fill-in-the-blanks "opinion" letters, and they introduced these lawyers to the CORNERSTONE people so they could market the packages to the general public, where they found Plaintiffs.   DEUTSCHE BANK also introduced its former employee DAN BROOKS and CLARION to the group to help market the deals and provide a layer of separation between DEUTSCHE BANK and the general public.   The purpose of the project was to enable DEUTSCHE BANK to make exorbitant profits from a series of useless and risk-free private currency trades.   DEUTSCHE BANK knew that the use of its name, and the implication that it had investigated and thoroughly "vetted" the deals, would lend legitimacy and credibility to the sales efforts, and these parties participated in marketing the deals as well as operating the integral mechanics of the deals.

46. After developing the bogus tax shelters and the plan to market them, the DEFENDANTS structured the transactions so that

19

their fees were between 5% and 10% of the tax savings the client
desired to achieve.   Of this amount, between 1% and 5% went to
DEUTSCHE BANK as the "spread" between the two options in the deal;
up to 3% went to CANTLEY & SEDACCA for producing an opinion letter
on the transaction (based on what other law firms charged for
issuing similar letters, most of the money received by CANTLEY &
SEDACCA appears to have been for the "idea" rather than the
"opinion"); and another 2% went to others including CANTLEY &
SEDACCA, who participated in the deals as promoters, as well, by
introducing and recommending the bogus tax shelters to other
clients who trusted them (sometimes CANTLEY & SEDACCA marketed and
sold the transactions without providing an opinion letter). These
others also included CLARION and CORNERSTONE.   CANTLEY & SEDACCA is
reported to have received $30 - $40 million in fees from the sale
of these shelters.  CORNERSTONE alone reportedly sold approximately
40 bogus MLD tax shelter packages.

47.  SEDACCA began "plane jumping" around the country selling
the bogus tax shelter packages, and CORNERSTONE began trolling for
clients with advertisements.   DEUTSCHE BANK was marketing the
packages to its existing clients and others identified by the
lawyers and CPAs, and along with CORNERSTONE gave · sales
presentations.  The crux of the pitch was always that a reputable
law firm would prepare an "independent" opinion letter confirming

Complaint for Damages & Equitable Relief.

**Exhibit 1**
**Page 32**

the propriety of the packages and transaction, which would supposedly provide insurance in the event of an audit.

48. DEUTSCHE BANK had created a tax shelter machine, and its role has been described by other participants:

> DEUTSCHE BANK is very good at negotiating fees. With their background and experience in this market they have a much better chance of obtaining agreement for this level of fee (i e. 50%) up front. As soon as the basis of the engagement is established they then introduce us as their advisors. The target (i.e. one of the clients) is told they don't have to pay us anything. We are advising DEUTSCHE BANK. When the deal closes, we can then bill DEUTSCHE BANK on a pre-agreed value basis.

> The advantage of using a financial intermediary such as DEUTSCHE BANK in this way is that it deals with both the pricing and the distribution issue at the same time.

49. DEUTSCHE BANK and CORNERSTONE entered into an arrangement whereby each would receive a certain portion of the fee for each bogus tax shelter package sold, with DEUTSCHE BANK's fee being at least the premium under the international currency trading contracts. The fee to each was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on the size of the transaction. DEUTSCHE BANK's employees personally received a portion of the fees from the transactions.

50. At no point in time did the DEFENDANTS disclose to the Plaintiffs the fact that DEUTSCHE BANK controlled every aspect of the MLD transactions or that the supposedly independent lawyers CANTLEY & SEDACCA were actually promoters of the deals. Rather, it was represented to Plaintiffs and all the other victims that the

sole role of DEUTSCHE BANK was as a counterparty in the trading transactions that would lead to the losses.

51. The DEFENDANTS also arranged for the preparation 'in-house' of the tax returns for the specially-created LLC and Corporate entities in such a way as to "take advantage" of the 'losses generated' by the "shelter."

52. At no time did defendants disclose to Plaintiffs the true fact that CANTLEY & SEDACCA were actually promoters; instead, Defendants represented that CANTLEY & SEDACCA's sole role was to provide an "independent" legal opinion as to the propriety of the strategy. Because they were promoters, however, CANTLEY & SEDACCA's legal opinion letter was not independent and thus provided, according to the IRS, no protection for an IRS audit. DEFENDANTS knew this.

**Defendants Sell the Tax Shelter Package to Plaintiffs.**

53. After starting their business, Sonik Technologies, Inc., in a garage in December, 1994, designing and building wireless narrowband data transceivers, Plaintiffs grew the company steadily and dramatically, and in late 1999 agreed to sell it to Vytek Wireless, Inc. Payment in the form of stock and cash was to occur during 2000 and 2001.

54. Plaintiffs, who were now facing the real prospect of a large, potentially taxable, cash windfall from the sale of Sonik, began to notice Defendants' advertisements in various publications

22

including Robb Report and other similar financial publications, and
airline in-flight magazines.    These advertisements purported to
offer for sale legitimate tax shelter strategies designed to
mitigate large capital gains or income tax obligations.    In late
2000 Plaintiffs contacted Defendants once or twice about their
products and services.    In the course of these contacts Plaintiffs
told Defendants their financial situation regarding the sale of
their business, its terms, and the expected financial payment
arrangements. Defendants began contacting and soliciting Plaintiffs
constantly and repeatedly to purchase their "package."

55.    In these contacts and advertisements Defendants hyped
themselves to Plaintiffs and the public as having been "successful
at bringing strategies to affluent individuals that were previously
only    available    to    corporate    or    institutional    clientele."
Defendants,    through    CORNERSTONE,    touted    themselves    as    an
"experienced team of advisors" using "strategies backed by legal
authority"    and    working    "with    many    of    the    largest    financial
institutions    in    the    world"    who    can    "customize    strategies
effectively    and    legally    to    reduce    your    tax    burden,"    saving
Plaintiffs and others "thousands in would-be tax dollars."    These
representations were and are false.

56.    Defendants    represented    falsely    that    they    possessed
strategies which legally allowed Plaintiffs and others to eliminate
tax liability for ordinary income, capital gains, and estate taxes,

23

Exhibit 1
Page 35

which their "team of attorneys, accountants, and investment
consultants" [including the LAWYER DEFENDANTS, DEUTSCHE BANK,
CLARION, and others] would customize for the benefit of Plaintiffs.
They also represented falsely that in October, 2001 "over 20 new
clients reduced their taxes" legally while employing the same or
similar strategies as they were now offering to Plaintiffs.
Defendants stated that these strategies were "backed by legal
opinions" and were performed in "alliances with major U.S.
financial institutions."

57. DEFENDANTS' documents also affirm that CORNERSTONE was at
times acting as a marketing and sales agent for illegitimate tax
strategies which were designed by DEUTSCHE BANK and its affiliates.

58. In January, 2001 Plaintiffs each received approximately
$225,000, and in March, 2001 Plaintiffs each received approximately
$900,000, of the purchase price for Sonik Technologies, Inc.
DEFENDANTS increased their pressure on Plaintiffs to purchase
DEFENDANTS' products and services.  DEFENDANTS sent Plaintiffs
additional solicitations by fax, mail, and even flew to San Diego
to meet with Plaintiffs.  DEFENDANTS stressed urgency, telling
Plaintiffs that they should "get in now or the opportunity will be
closed."  DEFENDANTS also represented specifically that Plaintiffs
could rely, and that the IRS would rely, on the lawyers'
supposedly-independent opinion letter attesting to the legitimacy
and legality of the tax shelter package.

24

59. In early December, 2001, DEFENDANTS, through their agent ROGER FULLER, met with Plaintiffs at Plaintiffs' offices. At this meeting DEFENDANTS explained the roles of DEUTSCHE BANK, the LAWYERS, and the opinion letters in the illegal MLD tax-avoidance scheme which they proposed to sell to Plaintiffs, and outlined generally how the package worked. At this time the DEFENDANTS assured Plaintiffs that the program was legal and proper. They represented that this tax savings strategy took advantage of a legal loophole in the tax code, and that an independent, reputable law firm would render an independent legal opinion to substantiate the legality and the validity of the MLD tax strategy.

60. On December 7, 2001 DEFENDANTS sent the engagement contract to Plaintiffs for signature, with instructions for Plaintiffs to sign it, send it back, and to wire DEFENDANTS' fee (which was a percentage of the desired tax loss to be achieved) along with other "investment" funds to capitalize the entities that would be used to generate the currency trades and tax losses.

61. Relying on DEFENDANTS' representations over the course of their contacts, and upon DEFENDANTS' stated expertise and experience, Plaintiffs signed DEFENDANTS' "Consulting Services Fee Agreement" with DEFENDANTS on December 10, 2001, and wired the sum of $107,000 to DEFENDANTS as the "flat fee" for this package, thereby purchasing DEFENDANTS' MLD products and services. The contract provided that, in exchange for this fee, the DEFENDANTS

25

1 would provide a turrkey and legitimate tax shelter package which
2 would legally and ethically relieve Plaintiffs from capital gains
3 tax obligations for the year 2001.

4 62.  DEFENDANTS introduced Plaintiffs to BROOKS of CLARION
5 (remember that BROOKS was formerly with DEUTSCHE BANK and had
6 helped develop and design the MLD for use as a tax strategy), and
7 Plaintiffs were told that, by buying DEFENDANTS' package they would
8 acquire substantial capital and ordinary tax losses which would be
9
10 used to offset Plaintiffs' gains.

11 63.  DEFENDANTS, in the person of BROOKS and DEUTSCHE BANK
12 (Craig Brubaker) then telephoned Plaintiffs that same day, after
13 receiving the signed agreement and their fee, for a conference
14 call.  "Now that you've paid," they said, "here's what you get and
15 what happens next."  In the conference call Plaintiffs specifically
16 asked DEFENDANTS to confirm that the transaction package was going
17 to allow Plaintiffs to legally claim the tax advantages advertised
18
19 by defendants, and DEFENDANTS said unequivocally "yes."
20

21 64.  The constant presence of DEUTSCHE BANK and the LAWYERS in
22 such representations and in the transaction, throughout the
23 contacts between Plaintiffs and Defendants, added credibility to
24 the transaction in the eyes of Plaintiffs, and Plaintiffs relied on
25 this in deciding to purchase DEFENDANTS' package.
26

27 65.  In a nutshell, the "tax shelter" package sold by
28 DEFENDANTS to Plaintiffs involved the formation of an S-Corporation

and a Limited Liability Corporation, owned and "capitalized" by Plaintiffs. This "capitalization" (approximately $230,000, also wired to DEFENDANTS on December 10, 2001) was purportedly used by DEUTSCHE BANK and CLARION to "trade" roughly $12,000,000 worth of foreign currency options over a period of time. These trades (which may not have actually occurred but which DEFENDANTS reported to have occurred), which began as an "investment" of $230,000, which always lost money, and which were carried out in the sole discretion of DEFENDANTS, generated a total capital loss to the S-Corps and the L.L.C's of $2,100,000. These capital losses were then used to offset the gains (from the sale of Sonik Technologies) on Plaintiffs' personal tax returns, prepared by Defendants.

66. The tax shelter package included:

- Documents creating a Limited Liability Corporation (K&J Investments X, LLC) including, but not limited to Certificate of Formation; Operating Agreement; SS-4 Application for EIN;

- Documents creating an S-Corporation, including Articles of Incorporation, SS-4 Application for Employer I.D., Bylaws, Minutes for Board of Directors and Shareholders Meetings, 2553 S Election Form;

- DEUTSCHE BANK Account Agreements for Plaintiffs and the LLC, Assignment Agreements Between Plaintiffs and DEUTSCHE BANK and the LLC;

27

- Correspondence from Plaintiffs to DEUTSCHE BANK purporting to provide information and grant authority to take various actions;

- Documents executing, assigning, and selling "MLD's" (Market Link Deposits);

- Authorization letters, transfer confirmations, and wiring instructions;

- Documents purporting to Assign Membership Units in the LLC to the LLC;

- Various representations and transactions by Defendants;

- Engagement letter and Legal Opinion Letter from the LAWYER DEFENDANTS; and

- Preparation of 2001 Tax returns for Plaintiffs, the S Corp and the LLC.

67. The DEFENDANTS prepared all these documents and presented them (except the Legal Opinion Letter and the tax returns), undated, to Plaintiffs for signature at a "signing party" meeting sometime on or about December 12, 2001. The DEFENDANTS' Legal Opinion Letter arrived in January, 2002.

**IRS Notice 2000-44**.

68. Unbeknownst to Plaintiffs, but known to (and undisclosed by) the Defendants at the time of the transactions, the specific MLD transaction package of goods and services sold by Defendants to Plaintiffs had <u>already</u> been listed by the IRS as an abusive and

28

illegal tax shelter. Unbeknownst to Plaintiffs (but known, or should have been known to, DEFENDANTS), the business entities created by the Defendants as part of the package sold to Plaintiffs "lacked economic substance". Unbeknownst to Plaintiffs (but known to, or should have been known to, DEFENDANTS), the transactions which the DEFENDANTS, and the business entities they created, engaged in ostensibly for Plaintiffs as part of the tax avoidance package had no "practical economic effect."

69. Back on September 4, 2000 the IRS had gone one step further than Notice 1999-59, as it watched these tax avoidance schemes morph, change, and grow in use (through the aggressive marketing techniques of people such as defendants). The IRS issued Notice 2000-44, listing several specific and general types of transactions which were illegal and fell within the parameters of IRS Notice 1999-59 as well. Among those transactions included in Notice 2000-44 was the very MLD investment transaction into which Defendants had seduced Plaintiffs, which the IRS declared to be "abusive" because it produced an "artificially high basis" and contained no real "economic risk" of loss. In other words, the transactions were tax frauds serving no purpose other than to avoid taxes. The attorneys, banks and accountants should have, and did, know better than to sell and operate them as legitimate investments or tax shelters.

70. DEFENDANTS' much-ballyhooed "legal opinion letter" which was part of the tax shelter package, and which was alleged to be the legal basis for the package, was a canned, pre-fabricated fill-in-the-blanks template essentially identical to other "legal opinion letters" generated by CANTLEY & SEDACCA and other law firms for other "investors" and other bogus tax shelters. In it DEFENDANTS failed to properly analyze or discuss IRS Notices 1999-59 and 2000-44, the relationship of Defendants' tax shelter package to those IRS Notices, and the effect of the Notices upon the tax shelter, its legality, and Plaintiffs. In it DEFENDANTS also failed to disclose the true fact (which they knew or should have known) that the Tax Shelter Package transaction DEFENDANTS were marketing and selling to Plaintiffs was illegal and would be rejected by the IRS, subjecting Plaintiffs not only to the taxes owed, but also to interest, penalties and additional charges and costs and professional fees to undo the transaction.

71. In October of 2003 Plaintiffs received a letter from Defendants stating that the IRS considered the package or transaction to be an abusive tax shelter, and that Plaintiffs should immediately file Amended Tax returns for the year 2001. Plaintiffs immediately engaged tax counsel and incurred fees, costs, interest and unknown tax penalties to undo DEFENDANTS' bogus tax shelter transaction.

30

## FIRST CAUSE OF ACTION
### Negligence
### (Against All Defendants)

72.  Plaintiffs incorporate Paragraphs 1 through 71 herein.

73.  In doing the actions set forth herein, including preparing, marketing, designing, selling, researching, vouching for, and failing to properly research the tax shelter package and the MLD transactions, failing to know or disclose the fact that the subject transaction was a listed transaction within the ambit of IRS Notice 2000-44 and IRS Notice 1999-59, failing to adhere to their own promises, failing to adhere to the obligations, rules and standards imposed on them by the IRS and the laws of the United States and the state of California and failing to properly recommend legal tax savings strategies which would not subject plaintiffs to audit, penalties and substantial legal expense, the Defendants were negligent.

74.  These Defendants had and voluntarily assumed a duty to properly and honestly and diligently provide good, legal, and proper tax and financial advice and services to Plaintiffs, upon which they had performed thorough and accurate due-diligence, and to perform their services untainted by conflicts of interest, and place Plaintiffs' interests ahead of their own.  Defendants failed to do so.  Defendants also had a duty to fully know and disclose all aspects and material facts surrounding the purported tax shelter, and failed to do so.

---

31

75. By their acts and statements set forth above, defendants fell below, and failed to comply with, the standards of care, rules, regulations and obligations required of such professionals, and breached their duties to plaintiffs, and thus were negligent.

76. As a legal and actual result of Defendants' negligence, Plaintiffs have suffered financial loss to be shown at trial.

## SECOND CAUSE OF ACTION
### Unfair Business Practices
### (Against All Defendants)

77. Plaintiffs incorporate Paragraphs 1 - 76 herein.

78. Plaintiffs bring this claim pursuant to California Business & Professions Code Sections 17200 - 17500 et seq. on behalf of themselves individually, and also in a representative capacity on behalf of the general public of the State of California, under the authority of these statutes.

79. Defendants' actions set forth herein constituted unfair, unlawful and/or fraudulent business practices as described in, defined in, and proscribed by these statutes.

80. Defendants deceived and misled Plaintiffs and the public by their acts as set forth herein, including, among other things, representing that their tax savings strategies and advice and decisions were legal and ethical and in compliance with State and Federal tax laws, rules and regulations including IRS Notice 1999-59 and Notice 2000-44. Plaintiffs and others are members of the public and were misled into entrusting their money to DEFENDANTS'

32

Complaint for Damages & Equitable Relief.

**Exhibit 1**
**Page 44**

illegal and abusive tax shelters. As is evidenced by the class action lawsuits filed by others against these Defendants and the action by the Department of Justice, other members of the public, including other clients of the Defendants, have been misled and will be misled if Defendants are allowed to continue their conduct.

81. Pursuant to Sections 17200 - 17500 et seq., Plaintiffs seek from these Defendants, and each of them, restitution and disgorgement of all fees, earnings, profits, compensation and benefit obtained as a result of these Defendants' actions.

82. In addition, pursuant to §17203 Plaintiffs seek an Order enjoining these Defendants, and each of them, as well as their agents, employees, representatives, and all persons acting in concert or participating with them, from continuing to engage in tainted tax savings services, and from continuing to engage in wrongful conduct which constitutes violations of §17200 et seq. in the sale of abusive tax savings plans. Plaintiffs and members of the public will be irreparably harmed without such an order.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against CORNERSTONE, BISHOP, FULLER,**
**CLARION DEFENDANTS, and LAWYER DEFENDANTS)**

83. Plaintiffs incorporate Paragraphs 1 - 82 herein.

84. In doing the actions herein, Defendants assumed and owed a fiduciary duty of the utmost integrity, trust, good faith, and confidence to Plaintiffs to put Plaintiffs' interests ahead of

33

their own. In addition, as licensed professionals, including CPAs,

tax advisors, and members of the bar of the states of Texas,

Georgia and Virginia, to whom Plaintiffs entrusted their financial

affairs, Defendants voluntarily assumed and owed a fiduciary duty

to provide Plaintiffs unbiased and untainted advice and services.

85. By their actions and the contracts between Plaintiffs and

Defendants, Defendants had, placed themselves into and assumed a

fiduciary relationship and a position of trust with respect to

Plaintiffs and the money and financial situation entrusted to them.

86. Defendants' actions set forth herein were a breach of

their fiduciary duties to Plaintiffs, and as a direct and legal

result of these Defendants' acts and omissions, Plaintiffs were

damaged in an amount to be proven at trial.

87. These Defendants' actions were willful, malicious and in

conscious disregard of these Plaintiffs' rights, thus justifying an

award of punitive and exemplary damages.

### FOURTH CAUSE OF ACTION
**Aiding & Abetting Breach of Fiduciary Duty**
**(Against the LAWYER DEFENDANTS and DEUTSCHE BANK DEFENDANTS)**

88. Plaintiffs incorporate Paragraphs 1 – 87 herein.

89. The LAWYER DEFENDANTS and DEUTSCHE BANK were aware of

the Fiduciary Duties owed to Plaintiffs by the other Defendants.

90. The LAWYER DEFENDANTS and DEUTSCHE BANK's actions set

forth herein, including preparing the defective legal opinion

letter and other documents listed above and carrying out the bogus

34

trades and transactions which were part of the illegal tax shelter package, and in performing other services for and on behalf of those other defendants, and in lending their names and credibility and legitimacy to the tax shelter package sold and marketed by the other defendants, gave substantial assistance to the breaches of fiduciary duty by those other defendants, and to the illegal and abusive tax shelter package.  In doing these actions, providing substantial assistance to the other defendants, these defendants acted for their own personal financial gain.

91.  Each of these defendants received compensation for their assistance in the abusive and illegal tax shelter scheme of which they played an important role. Plaintiffs relied on the advice given by each of these defendants and without the help of each of these defendants Plaintiffs would not have been inclined to participate in the illegal and abusive tax shelter, and indeed, such tax shelter scheme would not have been possible.

92.  As a direct and legal result of Defendants' actions and omissions, Plaintiffs have suffered damages to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Contract**
**(Against CORNERSTONE, BISHOP, FULLER and CLARION DEFENDANTS)**

93.  Plaintiffs incorporate Paragraphs 1 through 92 herein.

94.  At all times there existed between Plaintiffs and Defendants valid contracts whose components and terms are set forth above. Those contracts also contained an implied covenant of good faith and fair dealing.  In these contracts Defendants agreed to

35

1  provide Plaintiffs with proper, legal, legitimate tax planning and
2  advice and services, in exchange for a fee which Plaintiffs paid.
3  Defendants failed to do so.

4        95.   By their actions Defendants have breached said contracts
5  and the covenants, express and implied, therein, causing Plaintiffs
6  damages in an amount to be proven at trial.

7                        **SIXTH CAUSE OF ACTION**
8                         **Professional Malpractice**
          **(Against the LAWYER DEFENDANTS, FULLER and BISHOP)**
9

10       96.   Plaintiffs incorporate Paragraphs 1 through 95 herein.

11       97.   As Plaintiffs' tax advisors, accountants, and attorneys,
12  the Defendants owed Plaintiffs duties of care loyalty and honesty,
13  a duty to comply with the applicable standards of care, and a duty
14
    to comply with the applicable provisions of their codes of
15
    professional responsibility.
16

17       98.   These Defendants also had a duty to Plaintiffs to comply
18  with   the   applicable   standards   of   care   for   attorneys   and
19  accountants. By their actions defendants fell below the applicable
20  standards of care and were negligent, causing damages to Plaintiffs
21
22  in an amount to be proven at trial.

23                         **JURY TRIAL DEMAND**

24       Plaintiffs request a jury trial on all issues so triable.

25                          **PRAYER FOR RELIEF**
26
         WHEREFORE, Plaintiffs request judgment as follows:
27
28

                                   36

1.   Judgment in their favor against each Defendant, jointly and severally, for damages in an amount as proven, including return of the fees and monies paid to Defendants and all monies paid by Plaintiffs to undo and ameliorate and mitigate the effects of Defendants' actions including legal costs, tax penalties, and interest, pre-judgment interest; costs of suit; and attorneys fees as allowed by law;

2.   Extraordinary, equitable and injunctive relief, including restitution, disgorgement, an order freezing the assets of Defendants and/or attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' activities or other assets to assure that Plaintiffs have an effective remedy; and

3.   Such other and further relief, including exemplary and punitive damages where appropriate, as is just and proper.

**DREHER LAW FIRM**

Dated:  September 27, 2004        By:  _R S D___

Robert Scott Dreher
Attorneys for Plaintiffs

M:\JD\CASES\198\pleadings\slatnickcompl.doc

37

Complaint for Damages & Equitable Relief.

Exhibit 1
Page 49

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ⎯ Robert Scott Dreher, 120527 Dreher Law Firm, 135 5th Ave, Suite 202<br>San Diego, CA 92101<br>TELEPHONE NO: 619-230-8828 FAX NO: 619-687-0136<br>ATTORNEY FOR *(Name)* Kevin Slamick and John Sonnenburg | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE San Diego, 92101
BRANCH NAME: San Diego

CASE NAME:
   Slamick et al v Deutsche Bank AG et al

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER GIC 836362 |
|---|---|---|
| ☑ Unlimited ☐ Limited<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | JUDGE:<br>DEPT.: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
  b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
     issues that will be time-consuming to resolve      in other counties, states or countries, or in a federal court
  c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply):*
  a. ☑ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☐ punitive
4. Number of causes of action *(specify):* 6
5. This case ☐ is ☑ is not a class action suit.
Date: September 27, 2004

Robert Scott Dreher        ▶ _____
  (TYPE OR PRINT NAME)              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

Exhibit 1
Page 50

12/14/2001  14:45  1801521007  CORNERSTONE ADVISORS  PAGE  02

Sent 12/15/01

Deutsche Bank ☑

Deutsche Banc Alex. Brown

# Account Agreement

Name(s)  Kevin Slatnick

DB Alex. Brown LLC
P.O. Box 515
Baltimore, MD 21203

Address  2310 Cousteau Court
Vista, CA 92883

City

Account Number  223 - 79125-10

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of creak or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned," refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the Account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will have been correct. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts.**

This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the Account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the proceeding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long". "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

DEC 14 2001 15:05  18015210879  PAGE.02

Exhibit 2
Page 51

CORNERSTONE ADVISORS   PAGE  03

7. Authority to Borrow

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

8. Interest Charges

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

9. Credit Information and Investigation

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

10. Satisfaction of Indebtedness

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

11. Liens

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right, in accordance with your general policies (regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

13. Loan or Pledge of Securities and Other Property

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that now has been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out I will lose voting rights attendant to such securities.

14. Correspondent Account: No Agency

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

15. Joint Accounts

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. This authority shall continue for the execution of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

16. Foreign Securities

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, that unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be illiquid; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Banc AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

DEC 14 2001 15:05

Exhibit 2
Page 52

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Banc AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties.  (2) The parties are waiving their right to seek remedies in court, including the right to jury trial.  (3) Pre-arbitration discovery is generally more limited than and different from court proceedings.  (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.  (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.  I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance.  If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration.  No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied, or (2) the class is decertified, or (3) the customer is excluded from the class by the court.  Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns.  It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of the Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

Please Complete 22a or 22b as applicable.

**22a. Certification — Taxpayer Identification Number**

Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19

Signature _Keith Gilwick_ _____ Date _____

Social Security or Employer ID No. _152-100-5210_

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

Exhibit 2
Page 53

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK AND ARE SUBJECT TO INVESTMENT RISK INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.

I agree to open a margin account with you, and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Signature _____ Date _____

Signature _____ Date _____

Paragraph 22 of this Agreement includes a certification of the taxpayer identification number and information and representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not have a current tax certification and a valid exemption certification on file, a portion of all payments to the account.

FOR OFFICIAL USE ONLY        Branch Manager approval for margin accounts:

Signature _____ Date _____

Exhibit 2
Page 54

12/14/2001  14:45    18015210879    CORNERSTONE ADVISORS    PAGE  07

Sat 12/15/01

Deutsche Banc Alex. Brown

**Deutsche Bank** ☑

# Account Agreement

Name(s)  John Sonnenberg

DB Alex. Brown LLC
P.O. Box 515
Baltimore, MD 21203

Address  1750 Bella Laguna Court
Encinitas, CA 92024

223-791726-19

City

Account Number

## IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest, "You," and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my order not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts.**

This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) that undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sell order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased, you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/00)

DEC 14 2001 15:07

18015210879        PAGE.07

Exhibit 3
Page 55

7. **Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

8. **Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exclusion of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

9. **Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

10. **Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

11. **Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

12. **Margin Maintenance Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right, in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, my failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event you are authorized to sell any and all securities and other property in any of My Account(s) with you whether currently individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

13. **Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

14. **Correspondent Account, No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

15. **Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

16. **Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or issued on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid and are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors thereon may reflect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be difficult to interpret, than in the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws. (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and) you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

Exhibit 3
Page 56

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are not brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) including all related cash balances and shares in any mutual fund are not deposits or other obligations of Deutsche Bank AG or any other bank are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG grants in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from Deutsche Banc Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THIS AGREEMENT

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____   Date _____

Social Security or Employer ID No. ___ 392-V2-9499 ___

Signature _____   Date _____

Social Security or Employer ID No. _____

Signature _____   Date _____

Social Security or Employer ID No. _____

Exhibit 3
Page 57

12/14/2001  14:45  10015210       CORNERSTONE ADVISORS      PAGE  10

22b. Certification — Non-U.S. Resident

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

• When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes

• I will be obligated to pay interest on all sums I borrow from you.

• I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.

• By using a margin account to leverage my investments, I increase my risk of loss

• Deutsche Banc Alex. Brown will deduct all interest charges from my account

Deutsche Banc Alex. Brown represents to me that:

• My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me

• Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose to me the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19

Signature _____ Date _____

Signature _____ Date _____

Signature _____ Date _____

Paragraph 22 of this Agreement contains information in the ... taxpayer identification for that purpose and the ... and ... relating to the responsibility of backup withholding. If Deutsche Banc Alex. Brown does not receive this identification it will be required to act as a paying agent and to apply penalties to this account.

| FOR OFFICE USE ONLY | Branch Manager approval for margin accounts: |
|---|---|
| Signature _____ | Date _____ |

DEC 14 2001 15:09        10015210079      PAGE.10

**Exhibit 3**
**Page 58**

PAGE.15       212 469 3240       DEC 17 2001 21:52

# Deutsche Bank AG, London Branch



18 December, 2001

Market Linked Deposit Transaction
Our ref: 544265-1/ODET 59388

Kevin Slatnick
DB ALEX BROWN, DALLAS
200 CRESCENT COURT
SUITE 500
DALLAS TX 75201, USA

0012147407777

Deutsche Bank AG, London Branch
FX Options Operations
Winchester House
1, Great Winchester Street
London, EC2N 2DB

Telex: 84015555
Swift: DEUT GB2L
Direct Line: +44 207 545 8887

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Market Linked Deposit Transaction entered into between us Deutsche Bank AG, London Branch ("Party A","we","us","our") and Kevin Slatnick (Party "B","you","your") on the Trade Date referred to below (the "Transaction"). The terms of the Transaction to which this Confirmation relates are as follows:

1.      General Terms:

Redemption Amount:     EUR 12,408,759.00 ( Equivalent USD 11,050,000.00 @ .8905) (3.60% annualised actual/360)
Trade Date:            10 December 2001

Maturity Date:         27 December 2001, subject to adjustment in accordance with the Following Business Day Convention.

Business Days:         New York
Business Day Convention:  Following
Calculation Agent:     Party A

Bonus Coupon Fixing Date:  21 December 2001

Bonus Premium          EUR 1,227,226.00 ( Equivalent USD 1,092,645.00 @ .8905)
payable by Party A:

Bonus Premium          7 December 2001
Payment Date:

2.      Deposit :

Exchange Provisions:

Depositor:             Deutsche Bank AG London
Deposit Taker:         Kevin Slatnick
Deposit Amount:        EUR 12,408,759.00
Redemption Amount:     EUR 12,408,759.00 + (3.60% annualised actual/360)
Bonus Coupon:          EUR 1,963,582.00 ( Equivalent USD 1,748,552.00 @ .8905) (15.824% absolute)
Bonus Level:           USD 1.4158 per GBP 1.00

(a)     In addition to the payment by the Deposit Taker to the Depositor of the Redemption Amount on the Maturity Date, if the Spot Rate is at 10:00 a.m. (local time in New York) on the Bonus Coupon Fixing Date is (less) than or equal to the Bonus Level (such event being a "Bonus Event"), then upon the occurrence of such Bonus Event (i) Deposit Taker shall pay to Depositor on the Maturity Date the Bonus Coupon Amount. Unless a Bonus Event occurs, no Bonus Coupon payment shall be made by the Deposit Taker to Depositor on the Exchange Date.

544265-1

Exhibit 4
Page 59

(b)    Upon the occurrence of the Bonus Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Bonus Event and provide details of the occurrence of such Bonus Event. A failure to give such notice shall not, however, obviate the occurrence of the Bonus Event.

3.     Other Provisions:

(i)    Offices:

(a)    The Office of Party A for the Transaction is London; and
(b)    The Office of Party B for the Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

4.     Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)    Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)   Assessment and Understanding.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)  Status of Parties.  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

5.     ISDA Agreement:If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement"), then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement, then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.  In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree.  Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

6.     Definitions:

The definitions and provisions contained in the 2000 ISDA Definitions  as published by the International Swaps and Derivatives Association, Inc.  (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions, as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (as supplemented from time to time the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

544265-1

Exhibit 4
Page 60

Dec 20 01 05:01p    John Sonnenberg          1760-S36-1026          p.2

Please confirm that the foregoing correctly sets forth the terms of the agreement between you and us by executing the copy of
this Confirmation enclosed for that purpose and returning it to us or by sending to us a telex or telex substantially similar to this
letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your
agreement to those terms.

Yours sincerely,
for and on behalf of
Deutsche Bank AG, London Branch

By: _____          By: _____
Name:                                  Name:
Title:                                 Title:

Confirmed as of the date first above written:
Kevin Spanish

By: _____          By: _____
Name:                                  Name:
Authorised Signatory                   Authorised Signatory

For any query relating to this Confirmation please contact 001 212-463-4143.

Exhibit 4
Page 61

# Deutsche Bank AG, London Branch



18 December, 2001

**Market Linked Deposit Transaction**
Our ref: 544264-1/ODET 59388

Kevin Slatnick
DB ALEX BROWN, DALLAS
200 CRESCENT COURT
SUITE 500
DALLAS TX 75201, USA

0012147407777

Deutsche Bank AG, London Branch
FX Options Operations
Winchester House
1, Great Winchester Street
London. EC2N 2DB

Telex: 94015555
Swift: DEUT GB2L
Direct Line: +44 207 545 6987

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Market Linked Deposit Transaction entered into between us Deutsche Bank AG, London Branch ("Party A","we","us","our") and Kevin Slatnick (Party "B","you","your") on the Trade Date referred to below (the "Transaction"). The terms of the Transaction to which this Confirmation relates are as follows:

1.     **General Terms:**

Redemption Amount:     EUR 12,408,759.00 ( Equivalent USD 11,050,000.00 @ .8905) (3.60% annualised actual/360)
Trade Date:     10 December 2001

Maturity Date:     27 December 2001, subject to adjustment in accordance with the Following Business Day Convention.

Business Days:     New York
Business Day Convention:     Following
Calculation Agent:     Party A

Bonus Coupon Fixing Date:     21 December 2001

Bonus Premium
payable by Party B:     EUR 1,240,876.00 ( Equivalent USD 1,105,000.00 @ .8905)

Bonus Premium
Payment Date:     14 December 2001

2.     **Deposit :**

Exchange Provisions:

Depositor:     Kevin Slatnick
Deposit Taker:     Deutsche Bank AG London
Deposit Amount     EUR 12,408,759.00
Redemption Amount:     EUR 12,408,759.00 + (3.60% annualised actual/360)
Bonus Coupon:     EUR 1,985,401.00 ( Equivalent USD 1,768,000.00 @ .8905) (16.0% absolute)
Bonus Level:     USD 1.416 per GBP 1.00

(a)     In addition to the payment by the Deposit Taker to the Depositor of the Redemption Amount on the Maturity Date, if the Spot Rate is at 10:00 a.m. (local time in New York) on the Bonus Coupon Fixing Date is (less) than or equal to the Bonus Level (such event being a "Bonus Event"), then upon the occurrence of such Bonus Event (i) Deposit Taker shall pay to Depositor on the Maturity Date the Bonus Coupon Amount. Unless a Bonus Event occurs, no Bonus Coupon payment shall be made by the Deposit Taker to Depositor on the Exchange Date.

544264-1

— 0 —

Exhibit 4
Page 62

DEC 17 2001 21:52    469 3246    20:12 2001 21 DEC    PAGE.10

(b)    Upon the occurrence of the Bonus Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Bonus Event and provide details of the occurrence of such Bonus Event. A failure to give such notice shall not, however, obviate the occurrence of the Bonus Event.

3.    **Other Provisions:**

(i)    Offices:

(a)    The Office of Party A for the Transaction is London; and
(b)    The Office of Party B for the Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

4.    **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

5.    **ISDA Agreement:** If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement"), then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement, then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

6.    **Definitions:**

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions, as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (as supplemented from time to time the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

544264-1

DEC 17 2001 21:53 FR DEUTSCHE BANK    212 469 3246 TO 915141401111    P.10

**Exhibit 4**
**Page 63**

Please confirm that the foregoing correctly sets forth the terms of the agreement between you and us by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, London Branch

By:
Name:
Title:

By:
Name:
Title:

Confirmed as of the date first above written:
Kevin Baldrick

By:
Name:
Authorised Signatory

By:
Name:
Authorised Signatory

For any query relating to this Confirmation please contact 001 212-469-4163.

Exhibit 4
Page 64

PAGE.02    08152510879                                    DEC 19 2001 11:37
PAGE.01    212 469 3240                                    DEC 18 2001 13:34

# Deutsche Bank AG, London Branch



*113-74126-19*
John Sonnenberg
DB ALEX BROWN, DALLAS
200 CRESCENT COURT
SUITE 500
DALLAS TX 75201, USA

0012147407777

Market Linked Deposit Transaction
Our ref: 548767-1/ODET 59389

10 December, 2001

Deutsche Bank AG, London Branch
FX Option Operations
Winchester House
1, Great Winchester Street
London, EC2N 2DB

Telex: 04015555
Swift: DEUT GB2L
Direct Line: +44 207 545 8887

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Market Linked Deposit Transaction entered into between us Deutsche Bank AG, London Branch ("Party A","we","us","our") and John Sonnenberg (Party "B","you","your") on the Trade Date referred to below (the "Transaction"). The terms of the Transaction to which this Confirmation relates are as follows:

1.     General Terms:

Redemption Amount:      EUR 11,734,980.00 (Equivalent USD 10,450,000.00 @ .8905) (3.50% annualised actual/360)
Trade Date:             10 December 2001

Maturity Date:          27 December 2001, subject to adjustment in accordance with the Following Business Day
                        Convention.

Business Days:          New York
Business Day Convention:  Following
Calculation Agent:      Party A

Bonus Coupon Fixing Date:  21 December 2001

Bonus Premium           EUR 1,173,498.00 (Equivalent USD 1,045,000.00 @ .8905)
payable by Party B:

Bonus Premium           14 December 2001
Payment Date:                                                          *8159407*

2.     Deposit:

Exchange Provisions:

Depositor:              John Sonnenberg
Deposit Taker:          Deutsche Bank AG London
Deposit Amount:         EUR 11,734,980.00
Redemption Amount:      EUR 11,734,980.00 + (3.50% annualised actual/360)
Bonus Coupon:           EUR 1,877,597.00 (Equivalent USD 1,672,000.00 @ .8905)   (16.0% absolute)
Bonus Level:            USD 1.4180 per GBP 1.00

(a)     In addition to the payment by the Deposit Taker to the Depositor of the Redemption Amount on the Maturity Date, if the Spot Rate is at 10:00 a.m. (local time in New York) on the Bonus Coupon Fixing Date is (less) than or equal to the Bonus Level (such event being a "Bonus Event"), then upon the occurrence of such Bonus Event (i) Deposit Taker shall pay to Depositor on the Maturity Date the Bonus Coupon Amount. Unless a Bonus Event occurs, no Bonus Coupon payment shall be made by the Deposit Taker to Depositor on the Exchange Date.

548767-1

PAGE 02    P. 08/19    918052533469    TO      CORNERSTONE ADVISORS    DEC 18 2001 14:33 FR ALEX BROWN INC
                                                                              12/19/2001 11:18   08052510879

Exhibit 5
Page 65

PAGE.03     18012521679     DEC 19 2001 11:38

PAGE.02     212 469 3540     DEC 18 2001 13:34

(b)     Upon the occurrence of the Bonus Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Bonus Event and provide details of the occurrence of such Bonus Event. A failure to give such notice shall not, however, obviate the occurrence of the Bonus Event.

3.     Other Provisions:

(i)     Offices:

          (a)     The Office of Party A for the Transaction is London; and
          (b)     The Office of Party B for the Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

4.     Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)     Assessment and Understanding.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)     Status of Parties.  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

5.     ISDA Agreement:If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement"), then this Confirmation supplements, forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement, then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.  In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree.  Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

6.     Definitions:

The definitions and provisions contained in the 2000 ISDA Definitions  as published by the International Swaps and Derivatives Association, Inc.  (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions  as published by the International Swaps and Derivatives Association, Inc.,  the Emerging Markets Traders Association and The Foreign Exchange Committee (as supplemented from time to time the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

543757-1

DEC 18 2001 14:33 FR ALEX BROWN INC     12/18/2001 11:18     18012521879/9

91883593333409  TO     CURRENCY ONE ADVISORS     P.09/19     PAGE.09

Exhibit 5
Page 66

Please confirm that the foregoing correctly sets forth the terms of the agreement between us you and it by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets form the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, London Branch

By: _____       By: _____
Name:                               Name:
Title:                              Title:

Confirmed as of the date first above written:
John Sonnenberg

By: _____       By: _____
Name:                               Name:
Authorised Signatory                Authorised Signatory

For any query relating to this Confirmation please contact 001 212-469-4195.

Exhibit 5
Page 67

PAGE.05                18015210879                DEC 19 2001 11:18

PAGE.04        212 459 3240                DEC 18 2001 13:35

# Deutsche Bank AG, London Branch



18 December, 2001

Market Linked Deposit Transaction
Our ref: 548768-1/ODEY 69369

John Sonnenberg
DB ALEX BROWN, DALLAS
200 CRESCENT COURT
SUITE 500
DALLAS TX 75201, USA

0012147407777

Deutsche Bank AG, London Branch
FX Options Operations
Winchester House
1, Great Winchester Street
London, EC2N 2DB

Telex: 84615355
Swift: DEUT GB2L
Direct Line: +44 207 545 8967

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Market Linked Deposit Transaction entered into between us Deutsche Bank AG, London Branch ("Party A","we","us","our") and John Sonnenberg (Party "B","you","your") on the Trade Date referred to below (the "Transaction"). The terms of the Transaction to which this Confirmation relates are as follows:

1.   General Terms:

Redemption Amount:        EUR 11,734,980.00 (Equivalent USD 10,450,000.00 @ .8905) (3.60% annualised actual/360)
Trade Date:               10 December 2001

Maturity Date:            27 December 2001, subject to adjustment in accordance with the Following Business Day
                          Convention.

Business Days.            New York
Business Day Convention:  Following
Calculation Agent:        Party A

Bonus Coupon Fixing Date: 21 December 2001

Bonus Premium             EUR 1,160,590.00 (Equivalent USD 1,033,505.00 @ .8905)
payable by Party A:

Bonus Premium             14 December 2001
Payment Date:

*81594409*

2.   Deposit:

Exchange Provisions:

Depositor:                Deutsche Bank AG London
Deposit Taker:            John Sonnenberg
Deposit Amount:           EUR 11,734,980.00
Redemption Amount:        EUR 11,734,980.00 + (3.60% annualised actual/360)
Bonus Coupon:             EUR 1,856,943.00 (Equivalent USD 1,653,607.00 @ .8905)  (15.824% absolute)
Bonus Level:              USD 1.4158 per GBP 1.00

(a)   In addition to the payment by the Deposit Taker to the Depositor of the Redemption Amount on the Maturity Date, if the Spot Rate is at 10:00 a.m. (local time in New York) on the Bonus Coupon Fixing Date is (less) then at equal to the Bonus Level (such event being a "Bonus Event"), then upon the occurrence of such Bonus Event (i) Deposit Taker shall pay to Depositor on the Maturity Date the Bonus Coupon Amount. Unless a Bonus Event occurs, no Bonus Coupon payment shall be made by the Deposit Taker to Depositor on the Exchange Date.

548768-1

TO 918019933489    P.11/19.
PAGE 05      CORNERSTONE ADVISORS        18015210879      18:18    12/19/2001

DEC 18 2001 14:33 FR ALEX BROWN INC

Exhibit 5
Page 68

PAGE.06                    18015251079                           DEC 19 2001 11:39

DEC 18 2001 13:23            212 489 2848      PAGE.05

(b)     Upon the occurrence of the Bonus Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Bonus Event and provide details of the occurrence of such Bonus Event. A failure to give such notice shall not, however, vitiate the occurrence of the Bonus Event.

**3.     Other Provisions:**

(i)     Offices:

    (a)     The Office of Party A for the Transaction is London; and
    (b)     The Office of Party B for the Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

**4.     Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    Assessment and Understanding.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   Status of Parties.  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**5.     ISDA Agreement:** If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement"), then this Confirmation supplements, forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement, then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.  In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree.  Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation.  Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**6.     Definitions:**

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc.  (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions, as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (as supplemented from time to time the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern.  In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

548768-1

Exhibit 5
Page 69

PAGE.07                        1801521087 9                        DEC 19 2001 11:39

Please confirm that the foregoing correctly sets forth the terms of the agreement betwe:n you and -is by executing :he copy of
this Confirmation enclosed for that purpose and returning it to us or by sending to u:.a, :eier ar lcte.: subsianitialy similar to this
letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmatio: relates and indicates your
agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG. London Branch

By:                                              By:
Name:                                            Name:
Title:                                           Title:


Confirmed as of the date first above written:
John Schneeberg

By:                                              By:
Name:                                            Name:
Authorised Signatory                             Authorised Signatory

For any query relating to this Confirmation please contact 001 212-469-4195.

                                    542563-1

...PM P.13/19                      TO 918015932049   DEC 15 2021 14:34 FP FLEX BROWN INC
12-16 01   19:22          RECEIVED FROM:18015718479                      P.07

PAGE  07           CORNERSTONE ADVISORS           1801521087 9        11:18  12/19/2001

Exhibit 5
Page 70

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                                            )  ss
COUNTY OF LOS ANGELES   )

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is **333 South Grand Avenue, 26th Floor, Los Angeles, California 90071-1530**.

      On November 15, 2004, I served the foregoing document(s) described as:

**DEUTSCHE BANK AG'S AND DEUTSCHE BANK SECURITIES INC.'S, D/B/A DEUTSCHE BANK ALEX. BROWN, NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 28 U.S.C. §§ 1441, 1332 AND 9 U.S.C. § 205**

by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

[ X ]    **BY MAIL**  I placed such envelopes with postage thereon prepaid in the United States Mail at 333 South Grand Avenue, 26th Floor, Los Angeles, California.

[   ]    **BY PERSONAL SERVICE**  I caused such envelope to be given to a messenger for delivery by hand to the office of the addressee.

[   ]    **BY FACSIMILE**  The above-referenced document (together with all exhibits and attachments thereto) was transmitted via facsimile transmission to the addressee(s) as indicated on the attached mailing list on the date thereof.  The transmission was reported as completed and without error.

[   ]    **BY ELECTRONIC TRANSMISSION**  The above referenced document was sent via electronic transmission to the addressee(s)' email address as indicated on the attached service list.

[   ]    **BY FEDERAL EXPRESS**  I am readily familiar with Dewey Ballantine's business practices of collecting and processing items for pickup and next business day delivery by Federal Express. I placed such sealed envelope(s) for delivery by Federal Express to the offices of the addressee(s) as indicated on the attached mailing list on the date hereof following ordinary business practices.

[   ]    **STATE**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[X]    **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 15, 2004, at Los Angeles, California.

Leticia Gomez
Type or Print Name

Signature

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**

<u>Kevin Slatnick v. Deutsche Bank AG, et al.</u>
USDC -Southern District

Robert Scott Dreher, Esq.
Jennifer Hamilton, Esq.
DREHER LAW FIRM
Historic Louis Bank of Commerce Bldg.
835 Fifth Ave., Suite 202
San Diego, CA  92101

Phone: (619) 230-8828


James W. Huston, Esq.
Morrison & Foerster LLP
3811 Valley Centre Drive, Suite 500
San Diego, CA  92130

Phone:  (858) 720-5154


Kirk C. Lusty, Esq.
Attorney at Law
6021 South Kamas Drive
Salt Lake City, Utah  84118

Phone:  (801) 891-6839

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS
Kevin Slatnick and John Sonnenberg

## DEFENDANTS
'04 CV 2288   LAB (JMA)

Deutsche Bank AG; Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown; Cornerstone Strategic Advisors, LLC; Roger Fuller; D. Michael Bishop; Cantley & Sedacca, L.L.P.; Clarion Capital, LLC; Dan Brooks; and Does 1-50, inclusive

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Dreher Law Firm
Robert Scott Dreher
Jennifer L. Hamilton
835 Fifth Avenue, Suite 202
San Diego, CA 92101 Phone: (619) 230-8828

ATTORNEYS (IF KNOWN)
Dewey Ballantine LLP      (See Attachment)
David S. McLeod
Caroline Burgunder
333 S. Grand Avenue, 26th Floor
Los Angeles, CA 90071 Phone: (213) 621-6000

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
28 U.S.C. 1332, 1441

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Conditions | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

| | |
|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removal from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation |
| ☐ 7 Appeal to District Judge from Magistrate Judgment | |

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See Instructions):
JUDGE _____   Docket Number _____

DATE  11-15-04

SIGNATURE OF ATTORNEY OF RECORD   David S. McLeod (CB)

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PO $150.00   11/15/04   #108691   VB

Attachment

Dewey Ballantine LLP
Lawrence Hill
Seth Farber
1301 Avenue of the Americas
New York, NY  10019   Phone:  (212) 259-8000

# PROOF OF SERVICE

STATE OF CALIFORNIA         )
                            )  ss
COUNTY OF LOS ANGELES       )

     I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is **333 South Grand Avenue, 26th Floor, Los Angeles, California 90071-1530.**

     On November 15, 2004, I served the foregoing document(s) described as:

## CIVIL COVER SHEET

by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

[ X ]    **BY MAIL** I placed such envelopes with postage thereon prepaid in the United States Mail at 333 South Grand Avenue, 26th Floor, Los Angeles, California.

[ ]    **BY PERSONAL SERVICE** I caused such envelope to be given to a messenger for delivery by hand to the office of the addressee.

[ ]    **BY FACSIMILE** The above-referenced document (together with all exhibits and attachments thereto) was transmitted via facsimile transmission to the addressee(s) as indicated on the attached mailing list on the date thereof. The transmission was reported as completed and without error.

[ ]    **BY ELECTRONIC TRANSMISSION** The above referenced document was sent via electronic transmission to the addressee(s)' email address as indicated on the attached service list.

[ ]    **BY FEDERAL EXPRESS** I am readily familiar with Dewey Ballantine's business practices of collecting and processing items for pickup and next business day delivery by Federal Express. I placed such sealed envelope(s) for delivery by Federal Express to the offices of the addressee(s) as indicated on the attached mailing list on the date hereof following ordinary business practices.

[ ]    **STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[X]    **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 15, 2004, at Los Angeles, California.

Leticia Gomez
Type or Print Name          Signature

1

# SERVICE LIST

2

<u>Kevin Slatnick v. Deutsche Bank AG, et al.</u>
USDC -Southern District

3

4

5    Robert Scott Dreher, Esq.
Jennifer Hamilton, Esq.
6    DREHER LAW FIRM
Historic Louis Bank of Commerce Bldg.
7    835 Fifth Ave., Suite 202
San Diego, CA  92101
8
Phone: (619) 230-8828
9

10   James W. Huston, Esq.
Morrison & Foerster LLP
11   3811 Valley Centre Drive, Suite 500
San Diego, CA  92130
12
Phone:  (858) 720-5154
13

14   Kirk C. Lusty, Esq.
Attorney at Law
15   6021 South Kamas Drive
Salt Lake City, Utah  84118
16
Phone:  (801) 891-6839
17

18

19

20

21

22

23

24

25

26

27

28